581 S.E.2d 161

Dennis SAUNER, Cliff Derreth, Joanne Derreth, Timothy James McClelland, Robert Keith Brown, III, Darlene M. Hesseltine as attorney-in-fact for Curtis L. Hesseltine, Robert C. Hodge, Barney R. Atkinson, Richard L. Huggins, Ann Weeks Huggins, R. Donald Crews, Steven V. Foster, Charles H. Andrews, Robert Austin, and Edith Austin, on behalf of the residential, commercial, and all other leaseholders of property owned and leased by Santee Cooper, Plaintiffs,

of whom Dennis Sauner, Cliff Derreth, Timothy James McClelland, Robert Keith Brown, III, Darlene M. Hesseltine as attorney-in-fact for Curtis L. Hesseltine, Robert C. Hodge, Barney R. Atkinson, Richard L. Huggins, Ann Weeks Huggins, R. Donald Crews, Steven V. Foster, and Charles H. Andrews are the Appellants,

v.

PUBLIC SERVICE AUTHORITY OF SOUTH CAROLINA, d/b/a Santee Cooper, Respondent.

No. 25648.

Supreme Court of South Carolina.

Heard Jan. 22, 2003.

Decided May 12, 2003.

---

398

Bradford P. Simpson, D. Michael Kelly, B. Randall Dong, all of Suggs & Kelly, P.A., of Columbia; John E. Parker, of Peters, Murdaugh, Parker, Eltzroth & Detrick, of Hampton; and Reta S. Hampton, of Marietta, GA, all for Appellants.

B. Rush Smith, III, William C. Hubbard, Kevin A. Hall, C. Mitchell Brown, all of Nelson, Mullins, Riley & Scarborough, of Columbia; and Charles H. Williams and C. Bradley Hutto, of Williams & Williams, of Orangeburg, for Respondent.

Chief Justice TOAL:

Appellants appeal from the trial court's grant of summary judgment in favor of Respondent.

### FACTUAL/ PROCEDURAL BACKGROUND

Respondent, South Carolina Public Service Authority ("Santee Cooper"), was established in 1934 to develop the Congaree, Cooper, and Santee Rivers as a public utility.[1] Santee Cooper

---

1. S.C.Code Ann. §§ 58–31–10 et seq.

acquired 210,000 acres for this purpose, and flooded approximately 170,000 to form Lakes Marion and Moultrie. Under its license from the Federal Power Commission ("FPC"), Santee Cooper was required to maintain ownership of all land located within its project boundaries. As demand for recreational property increased, Santee Cooper began developing residential subdivisions on project land around the lake, making lots available for long-term lease to individuals.

In 1962, Santee Cooper's Board of Directors adopted a resolution that it would not sell any land in the leasing program. Some time later, Santee Cooper published a Land Policies and Procedures booklet in which it declared its policy on land sales. The booklet stated, "Santee Cooper does not, as a general rule, sell any property. The sale of property is only considered in cases where the property is declared surplus and such sale has no adverse affect on Santee Cooper, the community, or the public."

In 1979, the Federal Energy Regulatory Commission ("FERC"), the successor to the FPC, redefined Santee Cooper's project boundaries, removing most of the leased lots from the project boundaries as surplus.[2] Santee Cooper continued to lease lots after 1979, and by 1994, Santee Cooper was administering 2,931 fixed-term residential leases. The rents on these leases ranged from $75 to $300 annually and ran for terms of 40 to 50 years. Although the leases ran for lengthy fixed terms, either party could terminate the lease, with or without cause, by giving 90 days notice.

Many lessees made improvements on their leased lots, and the leases specifically addressed improvements to the property. The leases generally stated, "[u]pon any termination of this lease other than by the Lessor under the [90 day notice provision], any buildings and improvements remaining upon the property shall become the property of the Lessor." The lease agreements continued to operate on this basis into the 1990's.

In March 1993, Santee Cooper sent a letter to the lessees notifying them that it was considering selling the leased lots to the lessees. In July of 1994, Santee Cooper sent a survey to

2. The FERC's changes relieved 2,533 parcels of leased property from the original "no sale" prohibition.

the lessees to gauge their interest in buying their lots. In both letters, Santee Cooper stated that any decision to place leased property for sale would not have any affect on current lease contracts, and that leases would not be revoked if Santee Cooper decided to offer the lots for sale to the lessees. According to Santee Cooper officials, the overwhelming majority of lessees (78%) indicated that they would be interested in buying the lots they were leasing.

In January of 1995, Santee Cooper's Board authorized the initiation of a sales program, giving leaseholders an opportunity to buy their lots.[3] The Resolution established that Santee Cooper would hire qualified appraisal firms to establish "fair market value" for the lots, and would give a leasehold value credit of 15% if the lot were purchased within two years from the initial offering and a value credit of 10% if purchased within three to five years of the initial offering. Additionally, the Resolution offered those lessees who chose not to purchase their lots an option to renew for 10 years after the expiration of their leases if their lease did not so provide.

Santee Cooper notified its lessees of its intention to initiate this sales program and of the terms of sale encompassed in the Resolution. The letter estimated that surveys and appraisals of all the lots would be completed and the lots available for sale within 12 to 18 months. In closing, the letter assured the lessees that they were under "absolutely no obligation to purchase the lot and that [they] may continue with their lease agreement[s] through their expiration and any extensions as outlined [in the letter]."

Santee Cooper appraised the lots to determine their fee simple value in an *unimproved* condition. Each lot was appraised at least two times and the offered price was the average of the two appraisals, less the discounts for early purchase outlined in the letter to the lessees. After all lots were surveyed and appraised, Santee Cooper held public meetings to outline the appraisals and the discounts available. Santee Cooper also explained that upon purchase, Santee Cooper and the leaseholder would sign a mutual cancellation of the lease, after which the purchaser would receive fee simple title to the property.

---

3. Leased lots were not offered for sale to the public.

In response to Santee Cooper's program, many lessees organized to complain about the appraisal methods employed by Santee Cooper's appraisers. They formed the Santee Cooper Owners and Leaseholders Association ("SCOLA") and held meetings to discuss their dissatisfaction regarding the appraisal methods. Whether they were satisfied or dissatisfied with the offered price, many lessees purchased their lots, including most of the named plaintiffs in this suit.

Appellants filed their complaint in January of 1998.[4] Appellants moved for class certification in July 1998, and their motion was denied in February 1999. Appellants filed a motion to alter or amend the order denying class certification. Several months later, three more leaseholders ("Intervenor Appellants") filed a motion to intervene. The judge granted the motion to intervene and then denied the motion to alter the order denying class certification. In April 1999, Santee Cooper filed a motion for summary judgment on all causes of action. Appellants filed a motion for partial summary judgment. In May 2001, the circuit court granted summary judgment in favor of Santee Cooper.

Appellants raise the following issues on appeal:[5]

I. Did the trial court err in finding that no genuine issues of material fact exist to support the essential elements of Appellants' causes of action for breach of contract, negligent misrepresentation, and unjust enrichment?

II. Did the trial court err in failing to terminate Intervenor Appellants' permissive intervention?

III. Did the trial court err in denying Appellants' motion for class certification?

---

4. Ten people filed the original and amended complaints: Dennis Sauner, Cliff Derreth, Joanne Derreth, Timothy McClelland, Robert Brown, III, Darlene Hesseltine, Robert Hodge, Barney Atkinson, Richard Huggins, and Anne Weeks Huggins. All of the Appellants except Robert Hodge have purchased their lots. Appellant Hodge continues to lease; his lease will expire in 2025.

5. Before summary judgment was granted, Appellants abandoned several causes of action raised in their complaint. The remaining causes of action were breach of contract, negligent misrepresentation, unjust enrichment, and equitable estoppel. Appellants have not appealed the equitable estoppel issue.

IV. Did the trial court err in finding that Appellants' claim for negligent misrepresentation is barred by the South Carolina Tort Claims Act?

## LAW/ANALYSIS

### I. Genuine Issue of Material Fact

Appellants argue that the trial court erred in finding no genuine issues of material fact exist to support their causes of action for breach of contract, negligent misrepresentation, and unjust enrichment. We disagree.

Summary judgment is appropriate when there is no genuine issue of material fact such that the moving party must prevail as a matter of law. Rule 56(c), SCRCP. To determine if any genuine issues of fact exist, the evidence and all reasonable inferences must be viewed in the light most favorable to the non-moving party. *Summer v. Carpenter*, 328 S.C. 36, 492 S.E.2d 55 (1997). Upon review of the trial court's grant of summary judgment, the appellate court applies the same standard applied by the trial court pursuant to Rule 56(c), SCRCP. *George v. Fabri*, 345 S.C. 440, 548 S.E.2d 868 (2001).

### A. Breach of Contract

Appellants argue that the Santee Cooper Board's 1995 Resolution along with the letter sent by Santee Cooper to its leaseholders notifying them of the decision to sell the leased lots, constituted a unilateral modification of their contract (lease agreement) with Santee Cooper. We disagree.

At the summary judgment hearing, Appellants asserted that the Board's Resolution and letter to the leaseholders *unilaterally* modified their contracts, but the trial court appears to have applied the analysis for bilateral modification, not unilateral modification. On appeal, Appellants insist that the Resolution and letter constitute a unilateral modification, comparable to an employer's unilateral modification of its employee's contract of employment. Appellants claim that Santee Cooper unilaterally modified the provisions of the lease agreements by (1) giving ten year extensions to those lessees who did not have that option written into their leases, (2) removing Santee Cooper's 90 day cancellation authority, and (3) giving each leaseholder the option to purchase the property at fair market

value. Appellants then contend that Santee Cooper breached the modified lease agreements by failing to offer to sell the lots at fair market value. In order to represent fair market value, Appellants insist that the appraisals should have included the value of the leasehold interests.

Appellants cited this Court's decision in *Fleming v. Borden, Inc.*, 316 S.C. 452, 450 S.E.2d 589 (1994), in support of their unilateral modification argument. In *Fleming*, this Court considered whether an employer could *unilaterally* modify a *unilateral* contract created by the employee handbook. *Id.* Ultimately, the Court held that employers could unilaterally modify such contracts by amending the employee handbook as long as the employee had actual notice of the change. *Id.* The Court noted, however, that "the promisor does not enjoy the unfettered right to modify or terminate a unilateral contract prior to completion." *Id.* at 461, 450 S.E.2d at 594. Essentially, the Court made a policy exception from this general rule in the employer/employee context to allow employers "a mechanism ... to alter the employee handbook to meet the changing needs of [both parties]." *Id.* at 462, 450 S.E.2d at 595.

Appellants' reliance on *Fleming's* analysis is flawed. The original lease agreements between the Appellants and Santee Cooper are bilateral contracts, not unilateral contracts. A unilateral contract occurs when there is only one promisor and the other party accepts, not by mutual promise, but by actual performance. *See International Shoe Co. v. Herndon*, 135 S.C. 138, 133 S.E. 202 (1926). A bilateral contract, on the other hand, exists when both parties exchange mutual promises. *Id.* Here, the lease agreements are clearly bilateral: Santee Cooper promised to lease specified property to the Appellants and, in return, the Appellants promised to pay a certain amount of rent per year.

We cannot find anything in *Fleming* or elsewhere that allows a party to alter the terms of a bilateral contract by unilateral modification. It is well established that "[a] written contract may be modified by a subsequent agreement of the parties, provided the subsequent agreement contains all the requisites of a valid contract." *Florence City–County Airport Comm'n v. Air Terminal Parking Co.*, 283 S.C. 337, 341, 322

S.E.2d 471, 473 (Ct.App.1984). The necessary elements of a contract are an offer, acceptance, and valuable consideration. A valid offer "identifies the bargained for exchange and creates a power of acceptance in the offeree." *Carolina Amusement Co. v. Connecticut Nat'l Life Ins. Co.*, 313 S.C. 215, 437 S.E.2d 122 (Ct.App.1993).

The Board's Resolution and letter to the leaseholders did not identify the bargained for exchange (the sale price) or make acceptance an option. The letter simply explained that all lots would be resurveyed and appraised over the next 12 to 18 months. Notification that the Board had authorized Santee Cooper to sell the lots, and that Santee Cooper would begin the process of survey and appraisal for future sale, does not constitute an offer. As such, the Appellants' claim fails.

Furthermore, as a practical matter, the Board's Resolution and letter to the leaseholders do not modify the terms of the Appellants' lease agreements. Both the Resolution and the letter state explicitly that the terms of the existing lease agreements will be honored. All of the Appellants had the option to continue leasing until the leases expire at which point Santee Cooper agreed to renew the leases for an additional 10 years. Although the leaseholders may have expected that they would be able to renew and extend their leases into perpetuity, their lease agreements did not so provide. All of the lease agreements were made for definite terms, and each allowed for cancellation with 90 days notice, by either party, with or without cause. Therefore, we hold there is no genuine issue of material fact to support Appellants breach of contract claim.

## B. Negligent Misrepresentation

Appellants contend that Santee Cooper made two separate negligent misrepresentations to them: (1) that Santee Cooper negligently misrepresented that the appraisals would establish fair market value for the lots, and (2) that Santee Cooper negligently misrepresented the truth when it told leaseholders prior to the Board's Resolution that it would not sell the lots. Appellants' brief fails to analyze the elements of this cause of action or apprise the Court of how the facts of their case satisfy the elements of negligent misrepresentation. They simply assert that the representations by Santee Cooper

are "negligent misrepresentations" and argue that the trial court erred in finding there was no genuine issue of material fact to support their cause of action. We disagree.

■■■ To establish liability for negligent misrepresentation, the plaintiff must show "(1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the representation; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance upon the representation." *AMA Management Corp. v. Strasburger,* 309 S.C. 213, 420 S.E.2d 868 (Ct.App.1992). "Evidence of a mere broken promise is not sufficient to prove negligent misrepresentation." *Winburn v. Insurance Co. of North America,* 287 S.C. 435, 443, 339 S.E.2d 142, 147 (Ct.App.1985).

Appellants have not satisfied the elements of negligent misrepresentation. First, Santee Cooper's statement that it would "engage qualified appraisal firms to establish fair market value for each lot" has not been proven false. Appellants do not dispute that Santee Cooper engaged qualified appraisal firms, they simply disagree with the appraisal methodology employed by those firms. Santee Cooper's appraisers did not consider the value of the leasehold interests in their calculation of fair market value because Santee Cooper told them that the lots would be offered for sale only to the leaseholders. Santee Cooper and its experts contend it did establish fair market value for the lots and that the value of Appellants' leasehold interests were properly excluded from the appraisals based on the following rationale: [6]

   (1) Santee Cooper offered the lessees a choice; they could continue to lease or cancel their leases and purchase their lots. In other words, they were free to accept or reject the offer.

----

[6]. Douglas Brown and Thomas Hartnett submitted affidavits attesting to the validity of Santee Cooper's appraisal methodology. Both are certified real estate appraisers with extensive experience. Mr. Brown holds the MAI designation (the highest given by the Appraisal Institute) and is a past president of the Appraisal Institute.

(2) The leases contained cancellation clauses that allowed the lessee and the lessor to cancel the leases on 90 days notice. Therefore, the leases were never true long-term leases.

(3) The tenant was offered an opportunity to purchase the land in fee and cancel the lease; it was not required to do so.

Appellants' expert, Robert Jaeger, also submitted an affidavit. He asserts the proper methodology is the "discounted cash flow analysis." Although only a small portion of Mr. Jaeger's deposition was included in the record, it appears that Mr. Jaeger's opinion depends on the lease continuing to the end of its term. Mr. Jaeger was asked, "Does all of Paragraph 6 assume that the lease continues in place and runs to its term?" Mr. Jaeger answered, "It does." Santee Cooper argues that Mr. Jaeger conceded that his opinion depended on the lease not running to term. Appellants have done nothing to contradict Santee Cooper's assertion that Mr. Jaeger conceded this point. Similarly, Appellants have not disputed the fact that none of the purchased leases would continue to term because the parties executed a mutual cancellation of the lease upon purchase.

Regardless, Santee Cooper's statement that it would establish fair market value for the lots is a statement about the future. The appraisals had not been conducted at the time it made the statement. As such, it is not actionable as a misrepresentation. To be actionable, "the representation must relate to a present or pre-existing fact and be false when made." *Koontz v. Thomas,* 333 S.C. 702, 713, 511 S.E.2d 407, 413 (Ct.App.1999). Representations based on statements as to future events or unfulfilled promises are not usually actionable. *Id.*

This rule applies with equal force to bar Appellants' claim that statements made by Santee Cooper to the leaseholders that it would not or could not sell the leased lots were false prior to 1995. Santee Cooper was not authorized to sell the land by its Board until the 1995 Resolution. Accordingly, the statements were true when made. Therefore, we hold there is no genuine issue of material fact to support Appellants' negligent misrepresentation cause of action.

## C. Unjust Enrichment

Appellants argue that the trial court erred in holding no material issue of genuine fact exists to establish the essential elements of the cause of action for unjust enrichment. We disagree.

Restitution is a remedy designed to prevent unjust enrichment. *Stanley Smith & Sons v. Limestone College*, 283 S.C. 430, 434, 322 S.E.2d 474, 478 (Ct.App.1984). To recover on a theory of restitution, the plaintiff must show (1) that he conferred a non-gratuitous benefit on the defendant; (2) that the defendant realized some value from the benefit; and (3) that it would be inequitable for the defendant to retain the benefit without paying the plaintiff for its value. *Niggel Assoc., Inc. v. Polo's of North Myrtle Beach, Inc.*, 296 S.C. 530, 374 S.E.2d 507 (Ct.App.1988).

In *Player v. Chandler*, 299 S.C. 101, 382 S.E.2d 891 (1989), this Court found that the record failed to establish a cause of action for unjust enrichment. In *Player*, the plaintiffs leased property from the defendant, and built a restaurant on the property. *Id.* The lease contemplated improvements to the premises and established that plaintiffs could enjoy the use of the improvements during the term of the lease. *Id.* The dispute between the parties arose after plaintiffs offered to purchase the property, and defendant declined to sell, but said that he might be willing to extend the lease term. *Id.* The day after this conversation, plaintiffs began construction of a second restaurant on the property. Three weeks later, defendant told plaintiffs he would not extend the term of the lease unless additional terms and conditions were met. *Id.* The plaintiffs claimed that defendant was unjustly enriched by refusing to extend the lease. This Court disagreed, and found the plaintiffs would be able to enjoy their improvements for the term of the existing lease and that any retention of benefit by the defendant was a result of the initial terms of the lease. *Id.*

In our opinion, the facts here are similar to those in *Player*. Appellants' lease agreements provided that all improvements to the leased property would become the property of Santee Cooper upon termination of the lease (other than upon termination by Santee Cooper). The leases in this case were for very long terms, and Appellants were able to enjoy the

improvements they made for many years. Therefore, we find no genuine issue of material fact to support Appellants' claim for unjust enrichment.

## II. Intervention

■ Appellants contend that the trial court erred in denying Intervenor Appellants' motion to terminate intervention. We disagree.

Rule 24, SCRCP, provides for intervention of right and permissive intervention. Without citing any authority, Intervenor Appellants claim that because they intervened permissively under Rule 24(b), not as of right, they should be allowed to terminate their intervention whenever they choose. Rule 24(b) does not provide for any method of termination of intervention.

After Judge Smoak denied class certification, but while a motion to alter or amend that judgment was pending, Intervenor Appellants moved for permissive intervention. Judge Smoak granted their motion to intervene on June 8, 2000. A few days later, Judge Smoak denied Appellants' motion to alter or amend his order denying class certification. Intervenor Appellants then sought to terminate their intervention as a "result of denial of Plaintiffs' Motion for Reconsideration of the Class in the present case."

Judge Buckner denied the motion to terminate intervention finding that to do so would substantially alter or affect Judge Smoak's prior orders. *See Dinkins v. Robbins,* 203 S.C. 199, 26 S.E.2d 689 (1943). According to *Dinkins,* "the prior order of one Circuit Judge may not be modified by the subsequent order of another Circuit Judge, except in cases where the right to do so has been reserved to the succeeding Judge, when it is allowed by rule or statute, or when the subsequent order does not substantially affect the ruling or decision represented by the previous order." 203 S.C. at 202, 26 S.E.2d at 690.

Respondent argues that terminating intervention would have had a substantial affect on Judge Smoak's prior order granting intervention. We agree. When Intervenor Appellants moved to intervene in this action, they consented to the jurisdiction of the Orangeburg County Court of Common

Pleas and agreed to be bound by the rulings and judgment of such court. *See* 67A C.J.S. *Parties* § 86, at 843 (1978). By granting the motion, Judge Smoak made the decision that the rights of Intervenor Appellants would be adjudicated in this action. Judge Smoak grant of intervention and then denial of class certification indicate his intention for the ultimate judgment in this case to bind the Intervenor Appellants and preclude the relitigation of their claims in another forum.

■ The granting of intervention is wholly discretionary with the trial court and will be reversed only for abuse of discretion. *See South Carolina Tax Commn. v. Union City Treasurer,* 295 S.C. 257, 368 S.E.2d 72 (Ct.App.1988). We hold it was within Judge Buckner's discretion to deny Intervenor Appellants' motion to terminate intervention.

### III. Class Certification

Because we find there is no genuine issue of material fact to support the Appellants' causes of action, we decline to address this issue.

### IV. Tort Claims Act

Because we find there is no genuine issue of material fact regarding Appellants' negligent misrepresentation claim, we find it is unnecessary to address this issue.

### CONCLUSION

For the foregoing reasons, we **AFFIRM** the trial court's grant of summary judgment in favor of Santee Cooper and the trial court's denial of Intervenor Appellants' motion to terminate intervention. We find it unnecessary to address the class certification and Tort Claims Act issues.

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.