**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The Callawassie Island Members Club, Inc., Respondent,

v.

Mark K. Quinn and Sherry B. Quinn, Defendants,

Of whom Mark K. Quinn is the Appellant.

Appellate Case No. 2015-000003

———————

Appeal From Beaufort County
J. Ernest Kinard, Jr., Circuit Court Judge

———————

Unpublished Opinion No. 2018-UP-180
Submitted September 1, 2017 – Filed May 2, 2018

———————

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**

———————

Ian S. Ford and Neil Davis Thomson, both of Ford Wallace Thomson LLC, of Charleston, for Appellant.

M. Dawes Cooke, Jr., John William Fletcher, and Bradley B. Banias, all of Barnwell Whaley Patterson & Helms, LLC, of Charleston; Stephen P. Hughes, of Howell Gibson & Hughes, PA, of Beaufort; and James Andrew Yoho, of Carlock Copeland & Stair, LLP, of Charleston, for Respondent.

**PER CURIAM:** Mark K. Quinn appeals the circuit court's order granting summary judgment to The Callawassie Island Members Club, Inc. (CIMC). He argues the circuit court erred in (1) failing to apply the "scintilla of evidence" standard to CIMC's motion for summary judgment, (2) disregarding the voluminous evidence he presented in opposing CIMC's motion for summary judgment, (3) awarding damages under incorrect contract provisions and under incorrect interpretations of the applicable documents, (4) granting summary judgment in favor of CIMC on his counterclaims when he submitted evidence raising numerous issues of material fact, and (5) granting summary judgment prematurely because he did not have a full and fair opportunity to complete discovery. We affirm in part, reverse in part, and remand.[1]

Disregarding Evidence

Quinn argues the circuit court disregarded genuine issues of material fact and, therefore, erred in granting summary judgment in favor of CIMC. We have addressed Quinn's specific arguments below.

 *i. Contract*

Quinn first contends CIMC failed to prove a contract existed because he applied for membership in a different organization, the Callawassie Island Club, Inc. (CIC). We hold a question of fact does not exist as to whether Quinn was a member of CIMC. The evidence in the record supports the circuit court's finding that Quinn's membership in CIC transferred to CIMC upon the sale of the club. The 1994 Plan for the Offering of Memberships (Plan) expressly contemplated the transfer of CIC's assets to the members, which occurred in 2001 when CIMC assumed control. Quinn also continued paying dues and receiving the benefits of membership well after CIMC took control of the club.

 *ii. Governing Documents*

Quinn contends the circuit court disregarded (1) the differences among resigned, terminated, and expelled members; (2) the abundant evidence that he had been expelled by CIMC, which included testimony from CIMC's representatives and other club members regarding the expulsion process and documents showing

---

[1] We decide this case without oral argument pursuant to Rule 215, SCACR.

CIMC had previously expelled other members; (3) evidence that the governing documents had been improperly changed by CIMC to prohibit people from exiting the club; and (4) the abundant evidence that he had no obligation beyond his equity interest in his club membership.

### a. Resignation

Quinn contends there are genuine disputes as to (1) which governing documents are controlling and (2) the interpretation and application of the governing documents as they relate to his obligation to pay dues.

This court recently considered the same issues in *The Callawassie Island Members Club, Inc. v. Dennis*. 417 S.C. 610, 790 S.E.2d 435 (Ct. App. 2016), cert. granted (S.C. Sup. Ct. Order dated September 8, 2017). There, this court noted the 1994 general club rules (GCRs) provided that a member could terminate membership in the club by delivering written notice of termination to the club's secretary but would remain liable for any *unpaid* club account, membership dues, and charges. *Id.* at 616, 790 S.E.2d at 438. However, this court found this language different from that in other documents. *Id.* at 616–17, 790 S.E.2d at 438. This court stated,

> [U]nlike the 1994 GCRs, the 1994 CIC Plan and Bylaws provide resigned members are obligated to continue to pay dues *until their memberships are reissued*. Further ambiguity is found . . . in the 2009 GCRs, which provide that members who have terminated their club memberships remain liable for *unpaid* dues until their membership is sold. The term "unpaid" is not defined in the documents. It is unclear whether the language relating to unpaid dues refers to unpaid dues owed at the time of resignation or unpaid dues accruing before and after resignation.

*Id.* Based on this ambiguous language in the governing documents regarding "the issue of whether Appellants were obligated to pay dues post-resignation," this court reversed the grant of summary judgment to CIMC. *Id.* at 617, 790 S.E.2d at 438.

The same governing documents at issue in *Dennis* were used in this case. Like in *Dennis*, the 1994 Bylaws, the 1994 Plan, and subsequent revisions to the Plan consistently stated that resigned members had to continue paying dues until their memberships were reissued. However, the 1994 and 2001 GCRs provided that a

person who terminated his or her membership in the club would remain liable for any *unpaid* club account, membership dues and charges. The 2007 and 2009 GCRs added in that the member would remain liable for these "unpaid" charges "until the membership was sold."

When all of the governing documents are reviewed, an ambiguity exists regarding the obligation of a resigning member to continue paying dues post-resignation. Some of the documents state a member is responsible for paying dues until the membership is reissued, while others state the member is only responsible for "unpaid" dues, and the meaning of "unpaid" is not clear from the documents. *See id.* at 617, 790 S.E.2d at 438 ("The term 'unpaid' is not defined in the documents. It is unclear whether the language relating to unpaid dues refers to unpaid dues owed at the time of resignation or unpaid dues accruing before and after resignation.").

Although Quinn's brief essentially focuses on his belief that he was expelled from the club, there is some evidence that he attempted to resign his membership. In his answer, he not only sought a finding that he was expelled from the club but also contended that his resignation should be deemed effective. Additionally, in its answer to interrogatories filed by Quinn, CIMC stated it had in its possession a purported resignation from Quinn. *See Hancock v. Mid-South Mgmt. Co.*, 381 S.C. 326, 330, 673 S.E.2d 801, 803 (2009) (stating the nonmoving party is only required to submit a mere scintilla of evidence to withstand a motion for summary judgment in cases applying the preponderance of the evidence burden of proof). In light of this evidence and the ambiguity of the provisions governing the obligation of resigned members to continue paying dues, summary judgment was improper. *See HK New Plan Exch. Prop. Owner I, LLC v. Coker*, 375 S.C. 18, 23, 649 S.E.2d 181, 184 (Ct. App. 2007) ("[When] a contract is unclear, or is ambiguous and capable of more than one construction, the parties' intentions are matters of fact to be submitted to a jury."); *see also Cafe Assocs., Ltd. v. Gerngross*, 305 S.C. 6, 9, 406 S.E.2d 162, 164 (1991) ("As a general rule, written contracts are to be construed by the [c]ourt[,] but [when] a contract is ambiguous or capable of more than one construction, the question of what the parties intended becomes one of fact, and the question should be submitted to the jury.").

b. Expulsion

Quinn also contends that his liability for unpaid dues ended after four months of delinquency by the mandatory process of expulsion.

The *Dennis* court also addressed this issue and focused on the mandatory expulsion language of the 2001 GCRs and the testimony of the membership coordinator for CIC and CIMC, who stated she understood the expulsion provision to mean that after four months of delinquency, a member would lose his or her membership. 417 S.C. at 617, 790 S.E.2d at 439. This court stated,

> We acknowledge that section 13.3.1 provides club members *may* be suspended; however, in light of the subsequent mandatory expulsion language and the conflicting evidence presented as to the club's actual suspension and expulsion practices, we agree with Appellants that the language of the GCRs presented an ambiguity as to whether Appellants were entitled to expulsion and thus exposed to a maximum liability of four months' of unpaid dues (plus any accrued expenses). [When] there is some ambiguity in the governing documents as to whether expelled members are still liable for dues accruing after expulsion, summary judgment is inappropriate.

*Id.* at 617–18, 790 S.E.2d at 439.

Like in *Dennis*, the record contains the testimony of the membership coordinator, as well as the following provision from the 2001 GCRs:

> Any member whose account is delinquent for sixty (60) days from the statement date *may* be suspended by the Board of Directors. . . . Any member whose account is not settled within the four (4) months' period following suspension *shall* be expelled from the Club.

(Emphases added). There is evidence in the record that Quinn had been suspended by CIMC before the initiation of CIMC's action against him. The record contains a November 2011 list of suspended members that included Quinn. Also, CIMC's General Manager stated in an affidavit that CIMC had "been forced, owing to non-payment, to suspend" the membership rights and privileges of Quinn. However, the above provision from the 2001 GCRs was amended in 2007 and the mandatory expulsion language was removed. It states as follows:

> Any member whose account is delinquent for sixty (60) days from the statement date *may* be suspended by the Board of Directors. . . . Any member whose account is not settled within the four (4) month period following suspension *may* be expelled from the Club.

(Emphases added). Pursuant to this revision, CIMC would not have been obligated to expel Quinn despite his suspension. However, Quinn contends the governing documents were improperly changed by CIMC to prohibit people from exiting the club. He points to the following provision, which prohibits modification of the governing documents unless a majority of the members vote in favor of it:

> 2007 and 2012 Plan:
>
> > The Board of Directors may, in its sole discretion, amend or modify this Plan from time to time, so long as such amendments or modifications do not materially and adversely affect the rights of the Equity Members. Any amendment or modification which materially and adversely affects the rights of the Equity Members must be approved by a majority of the votes held by the Equity Members so affected.

Quinn stated in an affidavit that he never voted to change the requirement that a member must be expelled after four months of suspension and stated he was not aware of any vote to do so. Viewing this evidence in the light most favorable to Quinn, there is a genuine issue of material fact regarding whether the governing documents were improperly changed and whether the mandatory expulsion provision was still in effect at the time of Quinn's suspension from the club. *See Hancock*, 381 S.C. at 330, 673 S.E.2d at 803 (stating the nonmoving party is only required to submit a mere scintilla of evidence to withstand a motion for summary judgment in cases applying the preponderance of the evidence burden of proof). Thus, summary judgment to CIMC was improper. *See Dennis*, 417 S.C. at 618, 790 S.E.2d at 439 ("[When] there is some ambiguity in the governing documents as to whether expelled members are still liable for dues accruing after expulsion, summary judgment is inappropriate."); *see also Cafe Assocs., Ltd.*, 305 S.C. at 9, 406 S.E.2d at 164 ("As a general rule, written contracts are to be construed by the [c]ourt[,] but [when] a contract is ambiguous or capable of more than one construction, the question of what the parties intended becomes one of fact, and the question should be submitted to the jury.").

### iii. Nonprofit Corporation Act

According to Quinn, permitting CIMC to continue to levy dues, fees, assessments, and other charges against him is a violation of the South Carolina Nonprofit Corporation Act of 1994 (the Act) because it eliminates a person's right to resign from a nonprofit organization; it also conflicts with the governing documents, which do not state a member is responsible for dues and other charges after termination or expulsion. Quinn argues CIMC "cannot expel someone, bar them from all Club facilities, keep their equity contribution—and still demand that they pay dues, fees, assessments, and other charges for years to come."

We find the provision at issue from the Act, section 33-31-620 of the South Carolina Code (2006), does not require resigned members to continue paying dues that accrue after they resign. *See* § 33-31-620 (stating "[a] member may resign at any time" and "[t]he resignation of a member does not relieve the member from any obligations the member may have to the corporation as a result of obligations incurred or commitments made before resignation"); *see also Dennis*, 417 S.C. at 618, 790 S.E.2d at 439 ("Section 33-31-620 obligates resigned members to pay any dues incurred *before* resignation. This section does not require resigned members to continue to pay any dues that accrue *after* resignation. To do so, we believe, would create an unreasonable situation in which clubs could refuse to allow a member to ever terminate [his or her] membership obligations."); *id.* at 619, 790 S.E.2d at 439 ("[S]ection 33-31-620 protects club members from such continuing liability after resignation.").

Counterclaims

### i. Breach of Contract

Quinn argues there was sufficient evidence to support his breach of contract counterclaim, including that he established CIMC improperly amended material provisions of the governing documents to prevent members from leaving the club. Because of the interrelated nature between Quinn's breach of contract counterclaim and CIMC's breach of contract claim and, as stated above, the fact that relevant provisions of the governing documents are ambiguous, we reverse the circuit court's grant of summary judgment to CIMC. *See Hancock*, 381 S.C. at 330, 673 S.E.2d at 803 (stating the nonmoving party is only required to submit a mere scintilla of evidence to withstand a motion for summary judgment in cases applying the preponderance of the evidence burden of proof).

*ii.    Negligent Misrepresentation*

Quinn stated in his brief that he is not maintaining "that the prior entity, [CIC], by and through its governing documents, conveyed these false representations." Instead, Quinn argues "[t]he false representations occurred after the Club took over in 2001" and consisted of CIMC providing "methods for certain members to exit the Club without owing more than their equity contribution."  This evidence is insufficient to support Quinn's negligent misrepresentation counterclaim because allowing certain members to leave the club is not a *false* representation and it was not made to Quinn.  *See Sauner v. Pub. Serv. Auth. of S.C.*, 354 S.C. 397, 407, 581 S.E.2d 161, 166 (2003) ("To establish liability for negligent misrepresentation, the plaintiff must show "(1) the defendant made a *false* representation *to the plaintiff* . . . ." (emphases added)).  Therefore, the circuit court did not err in granting summary judgment to CIMC on this counterclaim.  *See* Rule 56(c), SCRCP (stating summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law").

*iii.    Section 33-31-621(d)*

Quinn argues the circuit court erred in dismissing his statutory violation claim because CIMC brought its breach of contract action after the one-year statute of limitations of section 33-31-621(d) of the South Carolina Code (2006), which states, "A proceeding challenging an expulsion, suspension, or termination, including a proceeding in which defective notice is alleged, must be commenced within one year after the effective date of the expulsion, suspension, or termination."

The circuit court did not address this issue in its order granting summary judgment to CIMC and Quinn did not raise it in his motion to reconsider.  Therefore, it is unpreserved.  *See Elam v. S.C. Dep't of Transp.*, 361 S.C. 9, 23, 602 S.E.2d 772, 779–80 (2004) ("Issues and arguments are preserved for appellate review only when they are raised to and ruled on by the lower court.").

<u>Attorney's Fees</u>

Because of our reversal of the grant of summary judgment to CIMC, we also reverse the award of attorney's fees to CIMC.  *See Camburn v. Smith*, 355 S.C. 574, 581, 586 S.E.2d 565, 568 (2003) ("An award of attorney's fees will be

reversed [when] the substantive results achieved by counsel are reversed on appeal.").

Remaining Issues

Based upon our reversal of the grant of summary judgment, the court need not address Quinn's remaining issues on appeal. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not address remaining issues when the resolution of prior issue is dispositive).[2]

Conclusion

We affirm the circuit court's grant of summary judgment to CIMC on Quinn's negligent misrepresentation counterclaim. We reverse the circuit court's grant of summary judgment to CIMC on its claims against Quinn and the accompanying award of damages, the grant of summary judgment to CIMC on Quinn's breach of contract claim, and the award of attorney's fees. Finally, we remand to the circuit court for trial.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**LOCKEMY, C.J., and HUFF and HILL, JJ., concur.**

---

[2] CIMC also raises several additional sustaining grounds, which we decline to address. *See I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 420 n.9, 526 S.E.2d 716, 723 n.9 (2000) ("The appellate court may or may not wish to address such [additional sustaining] grounds when it reverses the lower court's decision.").