ILLINOIS FARMERS INSURANCE COMPANY, et al.,
Respondents,

v.

GLASS SERVICE COMPANY,
Inc., et al., Appellants.

No. A03–109.

Supreme Court of Minnesota.

July 22, 2004.

Charles J. Lloyd, Matthew P. Lewis, Livgard & Rabuse, P.L.L.P., Minneapolis, MN, for Appellants.

Eric J. Magnuson, John M. Bjorkman, Paula Duggan Vraa, Rider Bennett, LLP, Minneapolis, MN, for Respondents.

# 796

William M. Hart, Thomas H. Propson, Livia E. Babcock, Meagher & Geer, P.L.L.P., Minneapolis, MN, for Amicus Curiae Ins. Federation of MN.

Thomas H. Goodman, Mark Thieroff, Siegel, Brill, Greupner, Duffy & Foster, P.A., Minneapolis, MN, for Amicus Curiae MN Ind. Auto Glass Ass'n.

## OPINION

ANDERSON, PAUL H., Justice.

Glass Service Company and its wholly-owned subsidiary, Auto Glass Service Center (collectively Glass Service), appeal from a Minnesota Court of Appeals decision requiring them to separately arbitrate over 5,700 individual claims of alleged underpayment by Illinois Farmers Insurance Company and Mid–Century Insurance Company (collectively Farmers). Glass Service asserts that Farmers underpaid it for glass work that it performed for Farmers' insureds. The alleged underpayments collectively total more than $1,000,000. The district court concluded that a mandatory arbitration clause in Farmers' insurance policy and Minnesota's No–Fault Automobile Insurance Act (No–Fault Act), Minn.Stat. §§ 65B.41–65B.71 (2002), require Glass Service to separately arbitrate each claim of alleged underpayment. The court also ordered the parties to arbitrate each underpayment claim before the same arbitration panel. The court of appeals agreed in part, but held that the parties were required to arbitrate each of the more than 5,700 alleged underpayments before separate arbitration panels. *Ill. Farmers Ins. Co. v. Glass Service Co., Inc.*, 669 N.W.2d 420, 428 (Minn.App.2003). We affirm in part, holding that arbitration is required, but we remand to the district court to determine whether some or all of these claims may be consolidated.

Minnesota's auto glass industry is highly regulated and the case before us appears to be another chapter in the evolving relationship between independent auto glass companies and automobile insurers. For example, legislation now bars insurers from requiring customers to use particular insurer-favored auto glass companies. Minn.Stat. § 72A.201, subd. 6(14)-(16) (2002). Likewise, the glass companies are prohibited from soliciting insureds as customers by offering gifts to those customers who choose to use their services. Minn. Stat. § 325F.783 (2002). Once a customer selects an auto glass company, the insurers are required to pay "a competitive price that is fair and reasonable within the local industry at large." Minn.Stat. § 72A.201, subd. 6(14) (2002). The Commissioner of Commerce is empowered to promulgate rules to enforce this legislation. Minn. Stat. § 72A.201, subd. 1 (2002).

Minnesota Statutes § 65B.134 (2002) requires that "[a]ny policy of automobile insurance * * * providing comprehensive coverage * * * must provide at the option of the insured complete coverage for repair or replacement of all damaged safety glass without regard to any deductible or minimum amount." By forbidding deductibles, Minnesota's statutory scheme for automobile insurance essentially removes the auto glass customer from the payment process. As a result, auto glass companies routinely bill their customers' insurance companies directly. Glass Service follows this practice and includes on its invoices language that its customer "assign[s] any and all claims in connection with this installation against my insurance company to Glass Service Company, Inc."

Glass Service asserts that Farmers underpaid it for glass work by systematically paying Glass Service less than the amounts stated on its invoices. According to Glass Service, this practice is contrary

to the requirements of Farmers' insurance policy, which requires payment in the "amount which it would cost to repair or replace damaged * * * property with other of like kind and quality." Glass Service alleges over 5,700 instances of underpayment, for which it demands compensation in the amount of $1,138,229.52, plus interest.

The amount of the alleged underpayments varies among the several claims. Some include discrepancies as large as 72.5 percent between the amount billed and the amount paid, while other discrepancies are as small as 5.5 percent. The underpayments result from work Glass Service performed across the state and span a five-year time period from August 1997 to April 2002.

During this time period, the regulatory structure of the auto glass industry changed significantly. An earlier statute regulating claims practices required insurers to "assume all reasonable costs sufficient to pay the insured's chosen [glass] vendor." Minn.Stat. § 72A.201, subd. 6(14) (1996). In 2000, the legislature amended this statute to require payment "based on a competitive price," and directed the Commissioner of Commerce to conduct a market survey to determine "a fair and reasonable market price for similar services." Minn.Stat. § 72A.201, subd. 6(14) (2000). Under this legislation, the market survey was to be used to establish prices for glass work when an insurer disputed an amount charged by a glass company. *Id.* The legislature again amended the statute in 2002 to require payment "based on a competitive price that is fair and reasonable within the local industry at large."[1] Minn.Stat. § 72A.201, subd. 6(14) (2002).

The parties agree that pricing in the auto glass industry is based primarily on three components: glass, adhesives, and labor. Both Glass Service and Farmers base their prices upon the National Auto Glass Specifications (NAGS), a national price-list publication. Glass Service charges prices for glass, adhesive, and labor that are percentages of the list prices. While Farmers pays Glass Service based upon identical NAGS figures, it employs different percentages of the NAGS list prices to calculate the amount it pays Glass Service. The NAGS list prices change quarterly and the parties adjust their prices accordingly. Therefore, the component prices that Glass Service charges and the amount that Farmers pays change on a regular basis.

Using its percentage of the NAGS list prices, Farmers regularly paid Glass Service less than the amount billed. Glass Service characterizes the pricing and payment method in the auto glass industry as "formulaic." It contends that the issues in its dispute with Farmers do not vary among the 5,700 claims. Rather, it contends that these claims against Farmers amount to one dispute over the percentage of the NAGS list prices to be used in calculating payments for auto glass work. While Farmers admits that its payments are based on formulas, Farmers contends that Glass Service oversimplifies the uniformity of the individual disputed claims. The record demonstrates that Glass Service utilized different percentages of the NAGS list prices throughout the five-year time period at issue. During this time period, Glass Service also adjusted the prices it charged for labor and adhesive.

---

1. The amended version of the No–Fault Act did not become effective until March 28, 2002. Act of March 27, 2002, ch. 283 (codified at Minn.Stat. § 72A.201, subd. 6(14) (2002)). Therefore, few, if any, disputed claims would be decided under this version of the Act.

Because the discrepancies between the amounts billed and the amounts reimbursed were relatively small, usually under $500, Glass Service rarely disputed individual claims. If Glass Service had disputed any of those claims individually, it would have been bound by a mandatory arbitration clause in Farmers' policy. The clause requires arbitration of "all cases where a claim made by an insured person is $5000 or less." The No–Fault Act also provides for the "mandatory submission to binding arbitration of all cases at issue where the claim at the commencement of arbitration is in an amount of $10,000 or less * * * for no-fault benefits or comprehensive or collision damage coverage." Minn.Stat. § 65B.525, subd. 1. The Act includes auto glass coverage under the umbrella of "comprehensive coverage." Minn.Stat. § 65B.134. None of the alleged underpayments in this case exceeds $5,000, so the parties agree that each customer's claim, standing alone, is subject to arbitration. But they disagree whether those claims must be arbitrated separately and, most critically, whether the 5,700 plus claims can be combined so that Glass Service's "claim" exceeds the jurisdictional amount for mandatory arbitration.

In 2002, Glass Service served a demand for arbitration of its claims against Farmers. Farmers in turn brought a declaratory judgment action in Ramsey County District Court, arguing that any assignment of claims from its policyholders to Glass Service did not include the right to arbitrate. Alternatively, Farmers sought a declaration that any right to arbitration did not include the right to arbitrate claims collectively. But then the parties' positions on arbitration changed. In its answer, Glass Service brought a counterclaim for breach of contract resulting from the alleged underpayments. In response, Farmers moved for summary judgment on the breach of contract counterclaim and sought a declaration that Glass Service

was required to arbitrate each claim individually. The court ordered the parties to arbitrate the claims separately, but required that each of the claims be arbitrated before the same arbitration panel. The court of appeals affirmed the district court's summary judgment ruling, but held that the district court erred when it required that all the claims be arbitrated before the same panel. *Ill. Farmers,* 669 N.W.2d at 428. Rather, the court of appeals held that the claims could not be consolidated to be heard by the same arbitration panel. *Id.* Glass Service petitioned for further review, which we granted.

I.

Before addressing whether any or all of the disputed claims must be arbitrated, we first address Glass Service's argument that Farmers waived its contractual right to mandatory arbitration under its insurance policy. Waiver is the voluntary and intentional relinquishment of a known right. *Har–Mar, Inc. v. Thorsen & Thorshov, Inc.,* 300 Minn. 149, 156–57, 218 N.W.2d 751, 756 (1974). One way a party may waive a contractual right to arbitration is if "judicial proceedings based on that contract have been initiated and have not been expeditiously challenged on the grounds that disputes under the contract are to be arbitrated." *Bros. Jurewicz, Inc. v. Atari, Inc.,* 296 N.W.2d 422, 428 (Minn. 1980). The party alleging waiver must provide evidence that the party that is alleged to have waived the right possessed both knowledge of the right in question and the intent to waive that right. *Stephenson v. Martin,* 259 N.W.2d 467, 470 (Minn.1977).

Glass Service makes a two-pronged argument for waiver. Its first argument is based on the language in the arbitration clause of Farmers' policy, which provides that if Farmers denies a claim, it is to

advise the claimant of the claimant's right to demand arbitration. Glass Service argues that the policy creates a condition precedent. Glass Service claims that, in order for Farmers to preserve its contractual right to mandatory arbitration, Farmers, after denying Glass Service's claim, was required to advise Glass Service of its "right to demand arbitration."

This argument requires us to determine whether the language of the arbitration clause in Farmers' insurance policy creates a condition precedent to demanding arbitration. The interpretation of insurance contracts is governed by general principles of contract law. *Thommes v. Milwaukee Ins. Co.*, 641 N.W.2d 877, 879 (Minn.2002). The interpretation of contractual language is an issue of law for the court to decide. *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn.2003). Contract language is ambiguous if it is reasonably susceptible to more than one interpretation. *Id.* When the language of an insurance contract is unambiguous, we interpret that language in accordance with its plain and ordinary meaning. *Thommes*, 641 N.W.2d at 880.

The arbitration clause of Farmers' policy provides that "[s]ubmission to binding arbitration is *mandatory* in *all* cases where a claim made by an insured person is $5,000 or less." (Emphasis added.) We conclude that the language in the arbitration clause is unambiguous and that its plain and ordinary meaning establishes that any claim under $5,000 automatically becomes arbitrable. Further, the policy does not make Farmers' ability to seek arbitration contingent upon the happening of any event. Absent a contractual condition precedent to Farmers demanding arbitration, Farmers cannot be said to waive any right set forth in the policy. Because arbitration under Farmers' policy is automatic and not contingent on any event, we conclude that Farmers did not waive its

right to demand arbitration when, after denying the claims, it failed to notify Glass Service of the right to arbitrate.

We next turn to Glass Service's second argument that Farmers waived its right to demand arbitration when it pursued litigation in district court. We have held that, in certain instances, a party may waive its right to arbitrate a dispute by litigating that dispute in the courts. For example, in *Anderson v. Twin City Rapid Transit Co.*, a contract between a local public transit authority and its union provided for arbitration of employment disputes arising from the transit authority's conversion from streetcars to buses. 250 Minn. 167, 170, 84 N.W.2d 593, 596 (1957). After a group of employees brought a wrongful discharge action in district court, the transit authority answered, conducted discovery, and defended the suit on the merits. *Id.* at 171–72, 84 N.W.2d at 597. When, 16 months after litigation commenced, the transit authority demanded arbitration, we held that the transit authority waived its right to arbitrate by allowing litigation to progress to such an advanced stage before demanding arbitration. *Id.* at 181, 84 N.W.2d at 602. We affirmed the principles of *Anderson* in *Brothers Jurewicz*, in which we held that a party waived its right to arbitration by answering a claim on the merits and allowing the district court litigation over the contract to proceed for over one year without moving the court to stay the proceedings and compel arbitration. 296 N.W.2d at 428.

Glass Service notes that, similar to the behavior of the parties in *Anderson* and *Brothers Jurewicz*, Farmers filed a declaratory judgment action in district court opposing arbitration. Glass Service argues that Farmers waived its right to arbitrate by bypassing the arbitration procedures in its insurance policy and the No–Fault Act.

Farmers responds by distinguishing *Anderson* and *Brothers Jurewicz* as cases in which the parties defended claims on the merits and allowed district court litigation to progress for a significant time before seeking arbitration. In contrast, Farmers notes that its declaratory judgment action was commenced not to resolve the merits, but rather to address the jurisdictional question of whether arbitration was required.

We are not persuaded by Glass Service's argument that, by pursuing litigation in district court, Farmers waived its right to demand arbitration. *Anderson* and *Brothers Jurewicz* are distinguishable in that each of those cases involved actions that were litigated in court on their merits for over a year before a party demanded arbitration. *Bros. Jurewicz*, 296 N.W.2d at 428; *Anderson*, 250 Minn. at 182, 84 N.W.2d at 603. Glass Service is correct that, in this case, Farmers initially contested Glass Service's right to arbitrate and opposed Glass Service's demand for consolidated arbitration. However, this opposition was jurisdictional and did not involve a challenge to the merits of Glass Service's claim. *See Patterson v. Wu Family Corp.*, 608 N.W.2d 863, 869 (Minn.2000) (holding that participation in discovery does not waive jurisdictional defenses). Farmers' current declaratory judgment action seeks only to determine where and how this dispute shall be resolved; it does not call upon the courts of this state to resolve the merits of the dispute. Because Farmers only asked the court to determine this preliminary question, we conclude that its actions do not demonstrate an intent to waive its right to arbitration.

 In addition, to the extent that this dispute is governed by the mandatory arbitration provision of the No–Fault Act, the doctrine of waiver does not apply. Minnesota Statutes § 65B.525, subdivision 1, mandates that all disputes over compre-

hensive coverage "in an amount of $10,000 or less" must be submitted to mandatory binding arbitration. *See also* Minn. No–Fault Arb. R. 6 (referring to "jurisdiction in mandatory cases"). The statute thereby deprives district courts of subject matter jurisdiction over a certain type of dispute—claims for comprehensive benefits of $10,000 or less. *Id.; see Olson v. Am. Family Mut. Ins. Co.*, 636 N.W.2d 598, 604 (Minn.App.2001) (noting that district court does not have jurisdiction over claims of "no-fault benefits"). Because the mandatory arbitration provision of the No–Fault Act limits the district courts' subject matter jurisdiction, the right to demand arbitration under the Act may not be waived. *See Marzitelli v. City of Little Canada*, 582 N.W.2d 904, 907 (Minn.1998) ("[I]t is blackletter law that subject matter jurisdiction may not be waived."); *Duininck Bros. & Gilchrist v. Brandondale Chaska Corp.*, 311 Minn. 291, 293, 248 N.W.2d 743, 744 (1976). We conclude that Farmers did not waive its right to demand arbitration under the No–Fault Act when it pursued a declaratory judgment action in district court in order to address whether arbitration was required.

## II.

 Glass Service also argues that we should adopt the equitable doctrine of judicial estoppel and use this doctrine to deny Farmers' demand for arbitration because Farmers has taken inconsistent positions in this litigation. Judicial estoppel is an equitable doctrine that prevents a party from assuming inconsistent positions in the course of litigation. *New Hampshire v. Maine*, 532 U.S. 742, 748–49, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001); *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600–01 (9th Cir.1996). Although we have never expressly adopted the doctrine of judicial estoppel, *State v. Profit*, 591 N.W.2d 451, 462 (Minn.1999), Glass

Service urges us to do so in order "to protect the integrity of the judicial process" from parties who play " 'fast and loose with the courts.' " *Konstantinidis v. Chen,* 626 F.2d 933, 937 (D.C.Cir.1980) (citation omitted). Glass Service argues that Farmers abused the judicial process by demanding arbitration after first opposing Glass Service's initial demands for arbitration. The court of appeals noted that we have declined to recognize the doctrine of judicial estoppel and therefore rejected Glass Service's argument. *Ill. Farmers,* 669 N.W.2d at 426.

We conclude that Glass Service does not present a compelling case to apply judicial estoppel. At different points in this litigation, both Glass Service and Farmers have demanded and opposed arbitration, presumably preferring the forum that they perceived as most beneficial at the time. *See Home Ins. Co. v. Nat'l Union Fire Ins. of Pittsburgh,* 658 N.W.2d 522, 535 (Minn.2003) ("It is a well-established principle that one who comes into equity must come with clean hands.") (internal quotations and citations omitted). While we neither adopt nor reject the doctrine of judicial estoppel, we conclude that neither party to this litigation would be entitled to the benefit of our equitable powers.

## III.

Next, we address Glass Service's argument that the district court and the court of appeals erred by concluding that arbitration is required. Here, we must first reconcile the mandatory arbitration terms of Farmers' insurance policy with the arbitration provisions of the No–Fault Act.

Farmers' policies provide:

> If an insured person and we [Farmers] do not agree (1) that the insured person is legally entitled to recover damages, or (2) on the amount of pay-

ment under this Part, the following applies:

Mandatory Arbitration

> Submission to binding arbitration is mandatory in all cases where a claim made by an insured person is $5000 or less. If we deny the claim we will advise you of your right to demand arbitration.

> In that event, the insured person will select an arbitrator and we will select another. The two arbitrators will select a third.

> If they cannot agree on the third arbitrator within 30 days, the judge of a court having jurisdiction will appoint the third arbitrator. The insured person will pay the arbitrator selected by that person.

> We will pay the arbitrator we select. The expense of the third arbitrator and all other expenses of arbitration will be shared equally.

> Arbitration will take place in the county where the insured person lives. Local court rules governing procedures and evidence will apply. The decision in writing of two arbitrators will be binding subject to the terms of this insurance.

The No–Fault Act states that this court and the "several courts of general trial jurisdiction of this state shall by rules of court or other constitutionally allowable device, provide for the mandatory submission to binding arbitration of all cases at issue where the claim * * * is in an amount of $10,000 or less * * *." Minn. Stat. § 65B.525, subd. 1. Pursuant to the No–Fault Act, we adopted rules for the administration of no-fault arbitration—the Minnesota No–Fault Arbitration Rules. The parties do not claim that the Rules create any inconsistencies with the Act and we find no inconsistencies ourselves. Furthermore, none of the amendments to the Act after our adoption of the Rules create

**802**

any conflict with the Rules at issue here. Accordingly, for purposes of the case before us, we treat the Rules as having the force and effect of statute. *Cf. U.S. West Material Resources, Inc. v. Comm'r of Revenue*, 511 N.W.2d 17, 20 n. 2 (Minn. 1994) (noting that administrative rules have the force and effect of law). Thus, in examining the potential conflicts between Farmers' policy and the No–Fault Act, we look to the No–Fault Rules in addition to the Act itself.

The Minnesota No–Fault Arbitration Rules require an arbitration organization to administer the selection of arbitrators in the following manner:

> The arbitration organization shall send simultaneously to each party to the dispute an identical list of four names of persons chosen from the panel. Each party to the dispute * * * [may] cross out a maximum of one name objected to, [and] number the remaining names in order of preference. * * * One of the persons who has been approved on both lists shall be invited by the arbitration organization to serve in accordance with the designated order of the mutual preference.

Minn. No–Fault Arb. R. 8.[2]

The procedure for arbitrator selection as established under the No–Fault Rules conflicts with Farmers' policy, which requires panel arbitration. Farmers' policy and the procedure under the No–Fault Act also have another crucial difference. Unlike Farmers' policy, which requires that most expenses be shared equally, arbitration under the Rules provides the single arbitrator with the discretion to assess arbitration expenses as part of an award. Minn. No–Fault Arb. R. 42.

■■■ In the absence of a legal restriction to the contrary, parties to an insurance contract, just as parties to other agreements, are free to bargain for the coverage they wish. *Bobich v. Oja*, 258 Minn. 287, 294, 104 N.W.2d 19, 24 (1960). But it has long been our policy that insurance policies "do[ ] not stand on the same footing as ordinary contracts. The business of insurance is quasi public in character; hence, it is competent for the state, in the exercise of the police power, to regulate it for the protection of the public." *Clark v. Rochester Farmers' Mut. Fire Ins. Co.*, 161 Minn. 476, 479, 201 N.W. 930, 931–32 (1925). If a term in an insurance contract conflicts with Minnesota statutes, the contract term becomes unenforceable. *Streich v. Am. Family Mut. Ins. Co.*, 358 N.W.2d 396, 399 (Minn.1984). An insurer may, however, provide an insured with broader coverage than the No–Fault Act or Rules mandate. *Gaalswyck v. General Cas. Co. of Wisconsin*, 372 N.W.2d 435, 437 (Minn.App.1985) (citing 8D Appleman Insurance Law and Practice § 5163 (1981)); *see also Watson v. United Services Auto. Ass'n*, 566 N.W.2d 683, 690 (Minn.1997) (holding that Minnesota standard fire insurance policy provides statutory minimum coverage). When an insurance policy contains a conformity clause, as Farmers' policies do, that clause amends all policy terms in conflict with Minnesota law to conform to those laws. *Lessard v. Milwaukee Ins. Co.*, 514 N.W.2d 556, 559 (Minn.1994).

■■■ As noted earlier, the use of panel arbitration in Farmers' insurance policy without the discretion to award costs conflicts with the single arbitrator method established under the No–Fault Rule.

---

**2.** The previous version of Rule 8, which was in effect when this litigation began, was identical to the current rule, except that the previous version specifically placed the administration of the no-fault arbitration system in the hands of the American Arbitration Association (AAA) rather than an "arbitration organization."

Compared with this procedure, Farmers' policy creates a system of dispute resolution that is decidedly disadvantageous to insured persons with small claims. Therefore, unless the policy provides greater protection for the insured than the No–Fault Act, the terms of the policy must be conformed to the provisions of the Act.

At oral argument, Farmers conceded that arbitration under its policy is costly and designed primarily for large claims. Arbitration under the No–Fault Rules, in contrast, requires the claimant to pay only a $60 filing fee and split the arbitrator's $300 fee. Minn. No–Fault Arb. R. 39 & 40. These lower fees, combined with the possibility that the claimant may be awarded arbitration costs from the insurer if he or she prevails, bestows a benefit on the insured by facilitating a low-cost method of dispute resolution. The efficiency of this model provides the insured with an incentive to arbitrate his or her dispute with the insurer. Farmers' policy deprives the insured of this benefit by forcing the insured to bear an equal share of the cost of panel arbitration, irrespective of the merit of his or her claim. Because Farmers' policy fails to provide its insureds with protections that are equal to or greater than the protections provided by the No–Fault Act and the Rules, we hold that the Act governs the issue of arbitrability in this case.

### IV.

Having decided that the No–Fault Act determines the arbitrability of the dispute between Farmers and Glass Service, we turn to the question of whether the No–Fault Act requires Glass Service to arbitrate its claims against Farmers. Questions of statutory interpretation are issues of law that we review de novo. *Mutual Service Cas. Ins. Co. v. League of Minnesota Cities Ins. Trust*, 659 N.W.2d 755, 758 (Minn.2003). We construe statutes in order to "ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2002). In doing so, we give effect to the plain meaning of statutory terms. Minn.Stat. § 645.08 (2002); *Miller–Largo v. N. States Power Co.*, 582 N.W.2d 550, 552 (Minn.1998).

Because Glass Service accepted payment from its customers in the form of assignments of their insurance claims against Farmers, we first must determine the rights and obligations that the No–Fault Act imposes on Glass Service as an assignee of Farmers' insurance policies. The district court concluded that, as an assignee of the policyholders' claims against Farmers, Glass Service stands in the shoes of the individual policyholders and therefore must arbitrate each claim as each claim was subject to arbitration before it was assigned to Glass Service. The court of appeals agreed that "ultimately, these are disputes between individual policyholders and their respective insurance companies." *Ill. Farmers*, 669 N.W.2d at 426. The court of appeals therefore held that the assignment of individual claims to Glass Service could not defeat the jurisdictional limit for no-fault arbitration. *Id.*

An assignment operates to place the assignee in the shoes of the assignor, and provides the assignee with the same legal rights as the assignor had before assignment. *Martin ex rel. Hoff v. City of Rochester*, 642 N.W.2d 1, 13 (Minn. 2002). Similarly, a debtor may assert all equities and defenses against the assignee that were available against the assignor. *Dennis v. Swanson*, 176 Minn. 267, 272, 223 N.W. 288, 290 (1929). Thus, if Farmers had the right to demand no-fault arbitration against individual policyholders, it will also have that right against Glass Service as assignee of the policyholders' claims against Farmers.

The No–Fault Act provides that arbitration is mandatory to resolve "all claims

* * * in an amount of $10,000 or less." Minn.Stat. § 65B.525. Black's Law Dictionary defines "claim" as "[t]he aggregate of operative facts giving rise to a right enforceable by a court." Black's Law Dictionary 240 (7th ed.1999). We have defined "claim" in the context of the arbitration provisions of the No–Fault Act as "the amount the claimant is asking for." *Brown v. Allstate Ins. Co.,* 481 N.W.2d 17, 19 (Minn.1992). Accordingly, we have held that a claimant could not split a no-fault claim between wage losses and medical expenses in order to bring her case under the jurisdictional limit for mandatory arbitration. *Charboneau v. Am. Family Ins. Co.,* 481 N.W.2d 19, 21–22 (Minn.1992).

Glass Service disagrees with how the district court and the court of appeals characterized its dispute with Farmers and argues that it is a single claimant with a single claim against Farmers. Citing the fact that its dispute with Farmers totals over $1 million, Glass Service relies on *Brown* for the proposition that, because it is asking for such a large sum from Farmers, its "claim" exceeds the jurisdictional amount for mandatory no-fault arbitration. Central to Glass Service's argument is its assertion that this case involves a single dispute between it and Farmers with a single issue, which issue is the systematic policy of short paying Glass Service invoices.

Farmers, on the other hand, argues that the "claimants" in this case are the individual policyholders. Because the amount of underpayment for each individual policyholder is under $10,000, Farmers argues that each policyholder has a "claim" of under $10,000, which is subject to mandatory arbitration. Farmers asserts that Glass Service, as an assignee, takes no greater or lesser rights than these individual policyholders. It then asserts that, because the individual policyholders could not avoid arbitration by consolidating their claims with those of other policyholders, Glass Service also lacks this ability. Thus, Farmers maintains that Glass Service is likewise required to arbitrate each of its claims under the No–Fault Act.

We agree with Farmers that Glass Service may not defeat the No–Fault Act's jurisdictional mandate for arbitration by consolidating the claims of Farmers' individual policyholders. The aggregate of operative facts that gave rise to the claims against Farmers at issue in this case were the individual auto glass jobs that Glass Service performed for Farmers' policyholders. Thus, after receiving glass work from Glass Service, the individual policyholders became claimants, each with a claim of less than $10,000 against Farmers. Glass Service chose to accept payment for glass work in the form of an assignment of the proceeds from Farmers' insurance policies. The form, volume, and amount of the assignments does not, however, transform Glass Service's status as an assignee of 5,700 plus individual claims into a claimant with a single claim of over $1 million. We therefore conclude that Glass Service is an assignee of 5,700 plus individual claims, each of which is subject to mandatory arbitration under the No–Fault Act.

Glass Service correctly points out that our holding in *Charboneau* prevents the splitting of individuals' no-fault claims against insurers. *See Charboneau,* 481 N.W.2d at 21–22. However, *Charboneau* is distinguishable, as it involved one individual claimant whose sole claim against her insurer arose from a single automobile accident and exceeded the jurisdictional amount for arbitration. *Id.* at 20. In *Charboneau,* we prevented an individual from forum shopping by splitting her claim into two separate components. *Id.* at 21. We are not willing to read *Charboneau* to sanction an equally undesirable form of forum shopping by allowing parties to

avoid mandatory arbitration for individual claims by treating those individual claims as one single claim.

In summary, the claimants in this case are the individual policyholders, each of whom possesses a claim against Farmers of under $10,000. Because the assignment of claims from the policyholders to Glass Service does not transform Glass Service's status from an assignee to an individual claimant, those claims are subject to no-fault arbitration after assignment. Therefore, we hold that the No–Fault Act requires that each of these claims be arbitrated.

Like the court of appeals, we recognize that the result we reach today may not be the most efficient method of resolving the underlying dispute between Glass Service and Farmers. *See Ill. Farmers*, 669 N.W.2d at 426. We are mindful of Glass Service's concern that the cost of more than 5,700 arbitrations could easily exceed the amount at stake in this matter. However, we must follow the mandate of the No–Fault Act, which unequivocally demands that *"all* claims in an amount of $10,000 or less be arbitrated." Minn.Stat. § 65B.525 (emphasis added). We note, however, that no-fault arbitration under the Rules, which utilizes a single arbitrator with the discretion to assess costs to a party, might allay some of Glass Service's concerns. *See* Minn. No–Fault Arb. R. 42. In addition to being more cost-effective than panel arbitration, this system may remove some of the disincentive for parties to arbitrate small claims.

## V.

Having decided that Glass Service is required to arbitrate its claims under the No–Fault Act, we next address Glass Service's alternative demand that its claims be consolidated into one arbitration proceeding. The No–Fault Act and our Rules of No–Fault Arbitration are silent on the ability of courts to consolidate arbitration proceedings. We do, however, have a leading case on the issue—*Grover-Dimond Assocs. v. Am. Arbitration Ass'n.*, 297 Minn. 324, 211 N.W.2d 787 (1973).

In *Grover–Dimond*, a building owner sought a consolidated arbitration proceeding to recover unauthorized expenses from two parties, an architect and a contractor. *Id.* at 325, 211 N.W.2d at 787–88. The building owner's contracts with the architect and the contractor each contained arbitration clauses. *Id.* at 325, 211 N.W.2d at 788. After acknowledging the lack of binding authority on the issue, we adopted the New York rule that the power of courts to order arbitration and enforce arbitration awards "imports power to regulate the method of enforcement," and then ordered consolidation. *Id.* at 328–29, 211 N.W.2d at 789 (citing *Matter of Chariot Textiles Corp.*, 21 App. Div.2d 762, 764, 250 N.Y.S.2d 493, 495 (1964)). We noted that, where consolidation is not prohibited by statute or by the agreement to arbitrate, consolidation of similar disputes prevents both redundancy and conflicting awards. *Grover–Dimond*, 297 Minn. at 329, 211 N.W.2d at 790. We stated that consolidation was particularly appropriate because the owner's disputes with the contractor and the architect involved common evidence and would likely result in the contractor and the architect blaming each other for the overcharges. *Id.* at 330, 211 N.W.2d at 790. We concluded that consolidation was proper in such a case, as it furthered the purpose of the Minnesota Uniform Arbitration Act, Minn.Stat. §§ 572.08–572.30 (2002), to "encourage arbitration as a 'speedy, informal, and relatively inexpensive procedure for resolving controversies arising out of commercial transactions.'" *Grover–Dimond*, 297 Minn. at 327, 211 N.W.2d at 788 (quoting *Layne–Minnesota Co. v. Regents of the Univ.*, 266

Minn. 284, 287, 123 N.W.2d 371, 374 (1963)).

Since *Grover–Dimond,* two competing views on consolidation have emerged in other jurisdictions. Some courts follow the rationale we adopted in *Grover–Dimond* and have allowed consolidation when it will increase the efficiency of the arbitration. *See Exber, Inc. v. Sletten Constr. Co.,* 92 Nev. 721, 558 P.2d 517, 524 (1976); *Litton Bionetics, Inc. v. Glen Constr. Co. Inc.,* 292 Md. 34, 437 A.2d 208, 217–18 (1981). Like *Grover–Dimond,* many of these cases involve "vertical consolidation," in which A has an arbitration agreement with B; B has an arbitration agreement with C; and a party seeks to consolidate the A v. B and B v. C arbitrations. *See Baesler v. Continental Grain Co.,* 900 F.2d 1193, 1196 (Brown, J., dissenting) (defining "vertical consolidation"). In authorizing consolidation, these courts have recognized the efficiency gains of consolidating proceedings that involve common parties, common evidence, and common witnesses. *See Exber,* 558 P.2d at 524. In addition, because in many of these cases there is a dispute over which one of several parties is responsible for damages, courts often cite the danger of inconsistent judgments as a justification for consolidation. *See Grover–Dimond,* 297 Minn. at 329, 211 N.W.2d at 789–90.

In contrast, several federal circuit courts have considered the issue of consolidation under the Federal Arbitration Act (FAA). The majority of these courts have refused to allow consolidation absent an explicit contractual or statutory mandate. *See Baesler,* 900 F.2d at 1195; *Weyerhaeuser Co. v. W. Seas Shipping Co.,* 743 F.2d 635, 637 (9th Cir.1984).[3] These courts have taken the view that their sole duty under

arbitration agreements is to ensure that agreements are enforced in accordance with their terms. Accordingly, the courts taking this view seek to protect the right of parties to receive their bargained-for dispute settlement mechanism, regardless of any inefficiencies that may result. *See Weyerhaeuser,* 743 F.2d at 637.

Our survey of the law as it has developed leads us to the conclusion that *Grover–Dimond* remains good law in Minnesota and that it should guide our decision in this matter. In *Grover–Dimond,* we based our holding in part on our state's policy under the Minnesota Uniform Arbitration Act of promoting arbitration as a cost-effective, simplified, and informal alternative to litigation. *Grover–Dimond,* 297 Minn. at 327, 211 N.W.2d at 788. Although this case arises under the No–Fault Act, the legislature's stated purpose behind the Act demonstrates that similar policy considerations are at work here. The No–Fault Act provides that one of its purposes is "[t]o speed the administration of justice, to ease the burden of litigation on the courts of this state, and to create a system of small claims arbitration to decrease the expense of and to simplify litigation." Minn.Stat. § 65B.42 (2002); *see also Charboneau,* 481 N.W.2d at 21 (quoting Minn.Stat. § 65B.42). If Glass Service is correct in its characterization of this controversy as a dispute over the "formulaic" method of reimbursement for glass work, the policy considerations that guided us in *Grover–Dimond* may well justify consolidation of the claims in this case.

When deciding whether to order consolidation, courts should consider the efficiencies of consolidation, the danger of inconsistent judgments if disputes are arbitrated separately, and the prejudice

---

**3.** The Eighth Circuit in particular has noted that the United States Supreme Court "explicitly rejected the assertion that the overriding goal of the [FAA] is to promote the expedi-

tious resolution of claims." *Baesler,* 900 F.2d at 1195 (citing *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 219, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985)).

that parties may suffer as a result of consolidation. *Grover–Dimond,* 297 Minn. at 329, 211 N.W.2d at 789–90. Efficiencies may result from a commonality of witnesses or evidence in multiple proceedings, similarity of claims between the parties, or the dependence of multiple claims on a common set of facts. *Exber,* 558 P.2d at 524. The desirability of consolidation to avoid inconsistent judgments is greatest in "vertical" cases such as *Grover–Dimond.* On the other hand, a court may find that the differences between claims, such as differences in governing law or factual differences between individual claims, make consolidation undesirable. A court also may determine that consolidation is inappropriate if it would prejudice the rights of one of the parties to the dispute. *See Seguro de Servicio de Salud de Puerto Rico v. McAuto Systems Group, Inc.,* 878 F.2d 5, 9 (1st Cir.1989).

 Whether consolidation is proper is a fact-sensitive question that is best decided by the district court exercising its sound discretion. We therefore reverse the court of appeals on the consolidation issue and remand this case to the district court for a determination of whether some or all of Glass Service's claims against Farmers may be consolidated into one or more proceedings. The court shall order the parties to arbitrate their disputes in accordance with our Rules of No–Fault Arbitration. If the court finds that some or all of the claims may be joined into one proceeding, it may, in its discretion, order consolidation of those claims.

Affirmed in part, reversed in part, and remanded.

GILBERT, J., took no part in the consideration or decision of this case.