**DELACY INVESTMENTS, INC. d/b/a Commission Express, Appellant,**

v.

**Steven Ernest THURMAN, Defendant,**

**Re/Max Real Estate Guide, Inc., Respondent.**

**No. A04–1439.**

Court of Appeals of Minnesota.

March 22, 2005.

Benjamin R. Skjold, Hellmuth & Johnson, PLLC, Eden Prairie, MN, for appellant.

Steven J. Lodge, Nash & Lodge, PLLP, Andover, MN, for respondent.

Considered and decided by HALBROOKS, Presiding Judge, HUSPENI, Judge,* and CRIPPEN, Judge.*

## OPINION

HALBROOKS, Judge.

Appellant challenges the district court's grant of summary of judgment to respondent based on the district court's conclusion that an assignee is not entitled to a greater right in a real-estate commission than an assignor. Appellant argues (1) that the district court erred in interpreting revised article 9 of the Uniform Commercial Code (UCC) as to the assignment of an account receivable and (2) that the UCC does not permit an account debtor to contract away the rights of an assignee after notice of assignment. Because we conclude that the district court did not err, we affirm.

## FACTS

Appellant Delacy Investments, Inc., d/b/a Commission Express (CE), is in the business of factoring receivables from real-estate agents. In this business, a real-estate agent can assign or sell his future receivable or commission to CE in exchange for immediate funds. Respondent Re/Max Real Estate Guide, Inc. (Re/Max) is a real-estate brokerage company.

On November 11, 2001, defendant Steven Thurman, a licensed real-estate agent, entered into a master repurchase and security agreement (MRSA) with CE. The substance of the MRSA "grant[ed] to CE a security interest under the [UCC] in all of [Thurman's] right, title and interest in and to [Thurman's] current and future accounts receivable...." CE perfected its security interest by filing a UCC financing statement with the Minnesota Secretary of State.

On February 25, 2003, Thurman entered into a standard independent-contractor agreement with Re/Max. The agreement details the employment relationship between the two, whereby Thurman agreed to pay Re/Max certain overhead expenses. The agreement explains how Thurman will receive his "commission" from Re/Max and certain "nonpayment remedies." In pertinent part, the agreement states:

[Thurman] shall be deemed entitled only to 100 percent of the amount by which commissions generated by [Thurman's] efforts *exceed* past-due financial obligations imposed by the terms of Paragraphs 4 and 5 of the Agreement. That portion of commissions which *does not exceed* past-due financial obligations shall be deemed to belong to RE/MAX and shall be used by RE/MAX first to offset arrearages owed by [Thurman].

(Emphasis added.) Thus, in terms of the legal relationships that exist here, CE is an "assignee," having accepted Thurman's assignment of his commission by the MRSA. Thurman, in turn, is an "assignor," having assigned his right of commission to CE. Re/Max is an "account debtor" by virtue of its independent-contractor agreement with Thurman, whereby Re/Max possesses the potential right to receipt of that which Thurman assigned to CE.

In April 2003, Re/Max executed an acknowledgement of CE's security interest in Thurman's account receivable from the sale of a home on Javelin Avenue and directed that Thurman's commission from

---

* Retired judges of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

that sale be paid directly to CE.[1] On April 22, 2003, CE and Thurman entered into an Account Receivable Sale and Assignment Agreement (assignment agreement), whereby CE agreed to purchase a $10,000 receivable related to Thurman's sale of a property on Keller Lake Drive in Burnsville (Keller Lake property).[2]

On June 7, Re/Max terminated Thurman as a real-estate agent for poor performance, failure to deposit earnest-money payments in a timely manner, and customer complaints. Re/Max asserts that at the time of his termination, Thurman had accumulated $11,126.38 in overhead debts owed to Re/Max. As a result, Re/Max refused to pay the assigned receivable and "applied the commission to Thurman's balance in accordance with [the independent-contractor agreement]," claiming a right of setoff based on the overhead expenses that Thurman owed. In Re/Max's words, "because the commissions earned by Re/Max as a result of Thurman's services did not exceed his past-due financial obligation to Re/Max, Thurman was entitled to no compensation at the Keller Lake closing, and so nothing was paid to CE pursuant to the assignment."

In June 2003, CE sent Re/Max a demand for immediate payment of the Keller Lake account receivable and sent a notice of default to Thurman. Re/Max did not pay. CE then filed a complaint in district court. Re/Max answered and counterclaimed against Thurman.[3] Both parties moved for summary judgment.[4] The district court denied CE's motion and granted Re/Max's, finding that "[CE's] ability to receive a commission from Re/Max is based upon Thurman's assignment of a contractual right to receive a commission from Re/Max." Therefore, the district court determined that "Thurman was not entitled to a commission at the time of the Keller Lake [p]roperty closing." As a result, it was "impossible for [CE] to obtain a greater right in the commission than Thurman had in the commission." This appeal follows.[5]

1. In its summary-judgment motion, Re/Max questioned the authenticity of this acknowledgment and denied that its representative actually signed the document. Regardless, this does not have a bearing on our decision today.

2. Pursuant to the assignment agreement, CE immediately paid $8,000 to Thurman and promised to pay him an additional $1,000 upon the receipt of the assigned receivable, in exchange for Thurman's assignment of a $10,000 receivable to be paid at the closing on the Keller Lake property.

3. Thurman is not a party to this appeal. A default judgment was entered against him following his failure to plead.

4. There is some dispute as to whether Re/Max properly moved for summary judgment. In its reply brief, CE claims that Re/Max's motion for summary judgment "was contained in its responsive pleading to CE's motion for summary judgment ... [and] created an unjust result because the denial of one [party's] motion for summary judgment is not the basis for granting another party's motion." But issues not raised or argued in an appellant's brief are waived and cannot be revived in a reply brief. *McIntire v. State*, 458 N.W.2d 714, 717 n. 2 (Minn.App.1990), *review denied* (Minn. Sept. 28, 1990); *see also* Minn. R. Civ.App. P. 128.02, subd. 3 ("The reply brief must be confined to new matter raised in the brief of the respondent."). While CE mentioned in its statement of the case that Re/Max "never formally made a motion for summary judgment or provided the appropriate papers" it did not argue the issue, and we decline to address it here.

5. The district court mistakenly entered "final judgment" on January 20 because claims against Thurman were still pending at that time. CE was therefore forced to appeal to this court, whose order opinion dismissing CE's appeal did not preclude a proper appeal from a final judgment. *Delacy Invs., Inc. v. Thurman*, No. A04–451 (Minn.App. Apr. 13, 2004). On July 15, 2004, the district court

## ISSUE

Did the district court err by granting summary judgment to respondent based on its interpretation of article 9 of the Uniform Commercial Code as to assignment of an account receivable?

## ANALYSIS

On an appeal from summary judgment, we ask two questions: (1) whether there are any genuine issues of material fact, and (2) whether the district court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). Whether a district court has properly construed a statute is a question of law subject to de novo review. *Lefto v. Hoggsbreath Enters., Inc.,* 581 N.W.2d 855, 856 (Minn.1998). When we interpret a statute, we look to see "whether the statute's language, on its face, is clear or ambiguous. A statute is only ambiguous when the language therein is subject to more than one reasonable interpretation." *Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000) (citation and quotation omitted). If the language in a statute is clear, we will rely on its plain meaning. Minn.Stat. § 645.16 (2004); *Correll v. Distinctive Dental Servs.,* 607 N.W.2d 440, 445 (Minn.2000).

### A. The District Court's Application of Minn.Stat. § 336.9–404

In granting Re/Max's motion for summary judgment, the district court determined that Thurman was not entitled to a commission at the time of the Keller Lake property closing. The court stated:

> The [c]ourt finds that [CE's] ability to receive a commission from Re/Max is based upon Thurman's assignment of a contractual right to receive a commis-

sion from Re/Max. Under Minn.Stat. § 336.9–404, an assignee's rights are subject to "(1) all terms of the agreement between the account debtor and the assignor . . .[.]" Minn.Stat. § 336.9–404 (2002). "A valid assignment generally operates to vest in the assignee the same right, title, or interest that the assignor had in the thing assigned." *Ill. Farmers Ins. Co. v. Glass Service Co. [ ],* 669 N.W.2d 420, 424 (Minn.App. 2003) (citation omitted), [*rev'd on other grounds,* 683 N.W.2d 792 (Minn.2004) ].

In the present action, Thurman was not entitled to collect a commission while his fees were in arrears. There is no question that at the time of the closing on the Keller Lake [p]roperty, Thurman was in arrears in his fees to Re/Max in the amount of approximately $11,126.38. The [c]ourt, therefore, finds that Thurman was not entitled to a commission at the time of the Keller Lake [p]roperty closing and that it is impossible for [CE] to obtain a greater right in the commission than Thurman had in the commission.

In challenging summary judgment, CE first argues that the district court erred by applying common law to the dispute, thereby permitting Re/Max to set off its overhead expenses after receiving notice of the assigned account receivable. As a result, CE claims that Re/Max improperly failed to pay it Thurman's commission for the sale of the Keller Lake property.

■ Reading the district court's order in context, we conclude that the district court applied the UCC provision relating to the assignment of an account receivable, even though it also cited a common-law rule expressed in this court's decision in

entered final judgment disposing of all claims. This court accepted jurisdiction and allowed the appeal to proceed "[u]nder the unusual

circumstances of this case." *Delacy Invs., Inc. v. Thurman,* No. A04–1439 (Minn.App. Sept.28, 2004) (order op.).

*Ill. Farmers Ins. Co. v. Glass Serv. Co.,* 669 N.W.2d 420, 424 (Minn.App.2003) ("[a] valid assignment generally operates to vest in the assignee the same right, title, or interest that the assignor had in the thing assigned"), *rev'd on other grounds,* 683 N.W.2d 792 (Minn.2004). That rule does not expressly conflict with Minn.Stat. § 336.9–404(a) (2004), the U.C.C. provision governing assignment in account receivables, which states:

(a) Assignee's rights subject to terms, claims, and defenses; exceptions. Unless an account debtor has made an enforceable agreement not to assert defenses or claims, and subject to subsections (b) through (e), *the rights of an assignee are subject to:*

(1) *all terms of the agreement between the account debtor and assignor* and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and

(2) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or assignee.

*Id.* (emphasis added). The official comment to the provision further explains its meaning:

Subsection (a) ... provides that an assignee generally takes an assignment subject to defenses and claims of an account debtor. Under subsection (a)(1), if the account debtor's defenses on an assigned claim arise from the transaction that gave rise to the contract with the assignor, *it makes no difference*

whether the defense or claim accrues before or after the account debtor is notified of the assignment.

Minn.Stat. § 336.9–404 cmt. 2 (emphasis added); *see also* Restatement (Second) of Contracts § 336, cmt. b (1981) (explaining that an assignor can assign "only what he has" and "is subject to limitations imposed by the terms of that contract [creating the right] and to defenses which would have been available against the [account debtor] had there been no assignment"). The particular issue presented here is one of first impression in Minnesota.[6]

■■■ Under Minn.Stat. § 336.9–404(a)(1) (2004), because the rights of CE are subject to *all* terms of the agreement between Re/Max and Thurman—namely, the independent-contractor agreement giving CE a right to all of Thurman's commissions which *exceed* past-due financial obligations to Re/Max—we conclude that CE cannot collect from Re/Max because the commissions earned by Re/Max as a result of Thurman's sales do not exceed his past-due financial obligations to Re/Max. As we recently explained, "[i]t is black-letter law that an assignee of a claim take no other or greater rights than the original assignor and cannot be in a better position than the assignor." *Ill. Farmers Ins. Co.,* 669 N.W.2d at 424. This most basic principle of commercial law is reflected in the Latin phrase *nemo dat qui non habet*—or, "no one may transfer more than he owns." *Commerce Bank, N.A. v. Chrysler Realty Corp.,* 244 F.3d 777, 780 (10th Cir.2001).

Our decision is further supported by a number of courts across the country interpreting former § 9–318(1) and revised

---

**6.** Both parties cite to *Nat'l Trade Trust, Inc. v. Merrimac Constr.,* 524 N.W.2d 14 (Minn.App. 1994). In that case, we held that "[a]n account debtor that erroneously pays the assignor after receiving notice of assignment waives any claim to a setoff against the assignor

raised for the first time *after* the assigned debt was paid." *Id.* at 17 (emphasis in original). Because that case was decided on narrow grounds factually distinguishable from the issue presented here, its application is of little value.

§ 9–404 of the UCC. *See* Minn.Stat. § 645.22 (2004) ("Laws uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them."). As the Texas Court of Appeals has explained, "when [an] assignee brings suit against the [account-debtor] ... to enforce rights conferred by the contract, the courts will almost universally agree that the [account-debtor] may assert *any* defense that might have been asserted against the assignor, being one of the original contract parties." *Irrigation Assoc. v. First Nat'l Bank of Frisco*, 773 S.W.2d 346, 348 (Tex.App.1989) (emphasis added). The Sixth Circuit has more recently interpreted the same UCC provision to "clearly limit[ ] the rights of ... the assignee, to those of the assignor ... and make[ ] its right to accounts receivable *subject to the provisions of* [the account debtor's] contract with [the assignor]." *Nat'l. City Bank, Northwest v. Columbian Mut. Life Ins. Co.*, 282 F.3d 407, 410 (6th Cir.2002) (emphasis added). In that case, the court concluded that "[t]here is no authority for the proposition that a perfected assignment to a third person takes precedence over a right of recoupment created between the original contracting parties in their contract."[7] *Id.*

In *Systran Fin. Servs. Corp. v. Giant Cement Holding, Inc.*, 252 F.Supp.2d 500 (N.D.Ohio 2003), an assignee first entered into a factoring agreement with an assignor who sold and assigned its accounts receivable to an assignee in exchange for its financing of assignor's operations. *Id.* at 502. Thereafter, assignor signed a transportation-services agreement with an account debtor which included an arbitration clause. *Id.* Assignee argued that it was not bound by this agreement to arbitrate and that it did not receive an assignment of an arbitration clause in a separate contract between the assignor and the account debtor. *Id.* at 503. According to assignee, under its factoring agreement with the assignor, it only received the right to payment of assignor's accounts. *Id.* Interpreting UCC § 9–404, the federal court explained that "courts have held that the assignee 'stands in the shoes of the assignor' and is 'subject to contract defenses or claims of the account debtor arising by virtue of the terms of the contract out of which the receivable was created.'" *Id.* at 505 (quoting *Oxford Commercial Funding, LLC v. Cargill, Inc.*, 2002 WL 31455989, at *3 (N.D.Ill.2002)). The court then concluded that the account debtor may properly assert that the arbitration clause (found in its contract with the assignor) as a defense against the assignee because arbitration was a "term[ ] of the agreement between the account debtor and assignor." *Id.* at 506 (alteration in original) (quoting Ohio Rev.Code § 1309.404).

Responding to the concerns raised by the assignee in *Systran Fin. Servs. Corp.*, the court concluded that "[i]f [the assignee] did not want to arbitrate disputes over collections from account debtors, it could have contracted with [the assignor] to prevent it from entering into any agreement that contained arbitration clauses. Because it did not do so, it is bound by the arbitration clause." 252 F.Supp.2d at 506. Similarly, here, if CE did not want to be bound by the independent-contractor agreement between Re/Max and Thurman, it could have contracted otherwise. But it

---

7. The case distinguishes between a right of "recoupment" and "setoff." "[A] right of 'recoupment' arises from the same transaction or contract that creates an asset whereas 'setoff' is a broader term referring to any claim or demand, however created, that the holder of the asset has against the debtor." *Nat'l. City Bank, Northwest*, 282 F.3d at 409 (citing *Black's Law Dictionary* 1439–40 (4th ed.1968)).

did not, and CE is thereby bound by the independent-contractor agreement between Re/Max and Thurman. As the assignee, CE cannot assume greater rights than Thurman, the assignor.

## B. Subsection (a)(2)

But CE also argues that Minn.Stat. § 336.9–404(a)(2) (2004) does not permit an account debtor to contract away the rights of an assignee *after* having received notice of a previously-executed assignment. According to CE, subsection (a)(2) limits which setoffs an account debtor may assert against a payment to an assignee after notice of the assignment. CE contends that Re/Max had notice of the assignment on three separate occasions: (1) statutory notice by CE's filing of the financing statement with the Secretary of State on November 14, 2001, after Thurman's execution of the MRSA; (2) actual notice that CE was entitled to all of the Thurman receivables when a notice of default regarding the Javelin Avenue property was delivered by certified mail on March 12, 2003; and (3) actual notice from the assignment of the Keller Lake receivable on April 22, 2003. CE argues that Thurman signed the MRSA with CE, giving CE a right to his commission, before Thurman signed the independent-contractor agreement with Re/Max.

■ The UCC defines "notice" as:

(d) A person "notifies" or "gives" a notice or notification to another person by taking such steps as may be reasonably required to inform the other person in ordinary course, whether or not the other person actually comes to know of it.

(e) ... [A] person "receives" a notice or notification when:

(1) it comes to that person's attention; or

(2) it is duly delivered in a form reasonable under the circumstances at the place of business through which the contract was made or at another location held out by that person as the place for receipt of such communications.

Minn.Stat. § 336.1–202(d)–(e) (2004). It therefore appears that Re/Max had notice of the assignment between Thurman and CE before its independent-contractor agreement with Thurman.

■ A perfected security interest is generally effective against creditors *"[e]xcept as otherwise provided* in the Uniform Commercial Code." Minn.Stat. § 336.9–201(a) (2004) (emphasis added). Minn. Stat. § 336.9–404(a)(1) provides otherwise. *See Nat'l. City Bank, Northwest*, 282 F.3d at 409–10 (explaining that the subsection clearly limits the rights of the assignee to those of the assignor). As one commentator explains, "[i]t makes no difference whether the defense or claim accrues before or after the account debtor is notified of the assignment if the account debtor's defenses on an assigned claim arise from the transaction that gave rise to the contract with the assignor." 20 Brent A. Olson, *Minnesota Practice* § 10.7.04 (2004). Minn.Stat. § 336.9–404(a)(2) does not govern the dispute here.

The plain language of Minn.Stat. § 336.9–404(a)(1) makes clear that the rights of CE (as an assignee) "are subject to ... all terms of the agreement between the account debtor and assignor." *Id.* Here, the independent-contractor agreement between Re/Max and Thurman limited payment to Thurman to those commissions that exceeded his past-due financial obligations to Re/Max. Because CE can take no greater rights nor be in a better position than Thurman by recovering a commission when Thurman, himself, was not entitled to the commission, the district

court did not err by granting summary judgment to Re/Max.

## DECISION

Because the plain language of Minn.Stat. § 336.9–404(a)(1) (2004) mandates that the rights of an assignee "are subject to . . . all terms of [an] agreement between the account debtor and assignor," we affirm the district court's grant of summary judgment in favor of respondent.

**Affirmed.**