# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1689

_____

Alpine Glass, Inc.,                                      *
                                                *

           Appellee,                 *
                                                *   Appeal from the United States
       v.                             *   District Court for the
                                                *   District of Minnesota.
Illinois Farmers Insurance Company;    *
Mid-Century Insurance Company,       *
                                                *

          Appellants.             *

_____

Submitted:  December 16, 2010
Filed:  June 17, 2011

_____

Before WOLLMAN, BRIGHT, and COLLOTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Illinois Farmers Insurance Company and Mid-Century Insurance Company (collectively, Farmers) appeal from the district court's[1] orders dismissing Farmers's counterclaim that Alpine Glass, Inc. (Alpine), violated Minnesota's anti-incentive statute, granting summary judgment in favor of Alpine on Farmers's counterclaim for breach of contract, and denying Farmers's motion to vacate the arbitration award. We affirm.

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

## I. Background

We begin with a summary from the district court:

> This is the latest round in the seemingly endless litigation between automobile insurers and auto-glass shops in Minnesota. Auto-glass shops repair or replace the windshields of customers and bill the customers' insurers. The insurers often refuse to pay the bills and accuse the auto-glass shops of trying to gouge them by charging ridiculously high prices for simple repairs. The auto-glass shops cry foul and accuse the insurers of trying to coerce consumers to accept shoddy work from cut-rate shops. Occasional attempts by the Minnesota Legislature to address this long-running dispute seem only to trigger additional rounds of litigation.

D. Ct. Order of Feb. 26, 2010, at 1.

Under Minnesota law, an insured who has purchased auto-glass coverage may select any vendor to repair or replace auto glass. Minn. Stat. § 72A.201, subd. 6(14)-(16). The insurer is required to pay the vendor directly for auto-glass work and must pay "a competitive price that is fair and reasonable within the local industry at large." Id. (quoted language at subd. 6(14)). The vendor may not offer or give the following as an inducement to the insured to purchase its goods or services: "any rebate, gift, prize, bonus, coupon, credit, referral fee, trade-in or trade-in payment, advertising or other fee or payment, or any other tangible thing or item of monetary value." Id. § 325F.783(a)(2).

### A. Factual Background

Alpine is a vendor that repairs and replaces auto glass in Minnesota. Alpine provides price quotes to its customers for auto-glass work. If the customer carries

auto-glass insurance, Alpine bills the quoted amount to the customer's insurer and releases the customer from any obligation to pay the difference between the amount billed and the amount the insurer pays. In return, the customer assigns the proceeds of the insurance policy to Alpine. Between May 2003 and January 2006, Alpine performed auto-glass work for Farmers's insureds, and the insureds assigned the proceeds of their insurance policies to Alpine. Alpine billed Farmers directly for the work it had completed.

Farmers insures automobile owners in Minnesota and provides auto-glass coverage. Every policy that Farmers issued to the insureds in this case contained the MN008 endorsement, which states that the maximum amount Farmers will pay for the repair or replacement of auto glass is the "prevailing competitive price." Most of the policies also contained the E1400 endorsement, which states that Farmers's "limit of liability for loss is the amount necessary to repair or replace safety glass."

In June 2002 and in February 2005, Farmers sent blast faxes[2] to Alpine that listed the prices Farmers intended to pay vendors for auto-glass goods and services. Each fax stated that the pricing structure set forth in the document "supersede[d] any prior pricing agreements with Farmers." During the relevant time frame, Farmers routinely received invoices from Alpine that did not conform with Farmers's pricing structure. Rather than paying Alpine the amount listed on the invoice, Farmers remitted a lesser amount, in accordance with the prices listed in its faxes.

This lawsuit arises from the dispute between Farmers and Alpine about how much Farmers is obligated to pay Alpine for auto-glass goods and services rendered on behalf of Farmers's insureds. At issue are 1,120 short-pay claims—claims in which Farmers remitted only part of the amount that Alpine invoiced.

---

[2]The faxes were unsolicited price lists that were sent by Farmers's third-party administrator to auto-glass vendors throughout Minnesota.

## B. Procedural History

Alpine, as assignee to the insureds, filed suit in state court seeking to consolidate the numerous claims and to compel arbitration under Minnesota's No-Fault Automobile Insurance Act. See Minn. Stat. § 65B.525. Farmers removed the action to federal district court, answered the complaint, and filed a counterclaim. The counterclaim alleged, among other things, that Alpine violated Minnesota's anti-incentive statute when it released customers from the difference between the amount Alpine billed and the amount Farmers paid, see § 325F.783, and that Alpine breached its unilateral contract with Farmers when it claimed amounts in excess of the prices listed in the blast faxes.

Alpine moved to dismiss the counterclaim. The district court granted the motion in part, dismissing six claims, including the claim alleging that Alpine violated Minnesota's anti-incentive statute. D. Ct. Order of Dec. 4, 2006, at 18. The district court allowed Farmers's breach-of-contract claim to proceed. Id. at 19. Thereafter, Farmers moved for summary judgment on its surviving claim, and Alpine moved to compel consolidated arbitration of the 1,120 short-pay claims. Following a hearing, the district court granted summary judgment in favor of Alpine on the breach-of-contract claim and ordered consolidated arbitration. D. Ct. Order of Mar. 30, 2007, at 1-2. The district court declined to decide which endorsement set Farmers's limit of liability, the MN008 or the E1400, leaving the issue to be decided in the first instance by the arbitrator.

Farmers appealed from the district court's orders dismissing its counterclaims, granting summary judgment in favor of Alpine, and ordering consolidated arbitration. While the appeal was pending, the case proceeded to arbitration. Farmers asked the arbitrator to decide which endorsement he would apply to determine the extent of Farmers's liability, and the arbitrator took the issue under advisement. Following the arbitration, the arbitrator found that "Farmers was paying a rate not based upon

competitive pricing in the auto glass replacement industry in Minnesota" and that "Farmers has underpaid Alpine $400,436.63." The arbitrator did not decide whether the MN008 or the E1400 applied because "the award is the same regardless of which policy endorsement is applicable." We later dismissed Farmers's appeal for want of jurisdiction. Alpine Glass, Inc. v. Ill. Farmers Ins. Co., 531 F.3d 679 (8th Cir. 2008).

Farmers moved to vacate the arbitrator's award, arguing that the MN008 endorsement limited its liability and that the arbitrator's failure to apply MN008 was error. The parties agreed that the "amount necessary to repair or replace" limit of E1400 was more generous than the "prevailing competitive price" limit of MN008. Following a lengthy hearing on the issue, the district court accepted their agreement and determined that the clauses did not conflict. The district court held that when a policy contains both endorsements, the E1400 governs over the MN008. The court stated:

> If the arbitrator applied the E1400, then the Court agrees with his decision, and need not vacate his award. If the arbitrator applied the MN008, then the Court disagrees with his decision, but the only one who could have been harmed by that decision is Alpine, and Alpine is not complaining. For these reasons, the Court need not vacate the award at Farmers's request.

D. Ct. Order of Feb. 26, 2010, at 18. The district court denied Farmers's motion to vacate the award but, noting that "Alpine ha[d] not sought an order confirming the arbitrator's award," did not enter an order of confirmation. Id. at 28. Nevertheless, the court entered judgment, stating that it had "adjudicated all of the claims and counterclaims that were pending before it." Id.

Farmers appealed, and thereafter Alpine moved for an order confirming the arbitration award. The district court refused to schedule a hearing to confirm the award because it was without jurisdiction to do so. Alpine moved to dismiss the

appeal, contending that the judgment was not final because the district court did not confirm the arbitration award. An administrative panel of this court denied Alpine's motion.

## II. Analysis

### A. Jurisdiction

The courts of appeals have jurisdiction over appeals from final decisions of the district courts. 28 U.S.C. § 1291. A district court's decision is final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Catlin v. United States, 324 U.S. 229, 233 (1945). Taken together, the orders dismissing Farmers's counterclaims, granting summary judgment in favor of Alpine, compelling consolidated arbitration, and denying the motion to vacate the arbitration award ended litigation on the merits. In those orders, the district court granted the declaratory relief Alpine requested in its complaint and dismissed or denied all counts of Farmers's counterclaim with prejudice. Nothing is left for the district court to do but to confirm the arbitration award and enter judgment. See Minn. Stat. § 572.21 ("Upon the granting of an order confirming . . . an award, judgment or decree shall be entered in conformity therewith and be enforced as any other judgment or decree."). Farmers has raised its defenses to confirmation in its motion to vacate and has acknowledged that it cannot otherwise challenge the confirmation. See Minn. Stat. § 572.19, subd. 2 (requiring that an application to vacate an arbitration award be made "within 90 days after delivery of a copy of the award to the applicant"); Abd Alla v. Mourssi, 680 N.W.2d 569, 572 (Minn. Ct. App. 2004) (concluding that Minnesota Statutes § 572.18 "unambiguously requires the district court to confirm the arbitration award unless grounds to vacate or modify the award are properly brought before the court"). We thus conclude that the district court has issued a final decision, and we have jurisdiction to consider Farmers's appeal therefrom.

B. Dismissal of Claim Alleging Violation of Anti-Incentive Statute

Farmers contends that the district court erroneously dismissed its counterclaim alleging that Alpine violated Minnesota's anti-incentive statute, Minnesota Statutes § 325F.783. The counterclaim alleged that as an inducement for the insured's assignment of the proceeds of the insurance policy, Alpine promised that it "would release the Insured from any obligation to pay the difference between the amounts [Farmers] agreed to pay pursuant to the terms and conditions of the Policies and all applicable law and the excessive prices charged by [Alpine]." According to Farmers, the practice constituted an unlawful credit or rebate to induce the insureds to do business with Alpine, in violation of the anti-incentive statute. We review *de novo* the district court's interpretation of the Minnesota statute. Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 401 F.3d 901, 917 (8th Cir. 2005).

Under Minnesota law, "[t]he object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16. The statutory question here is whether the Minnesota legislature intended to forbid Alpine's practice. "We determine legislative intent 'primarily from the language of the statute itself.'" Brayton v. Pawlenty, 781 N.W.2d 357, 363 (Minn. 2010) (quoting Gleason v. Geary, 8 N.W.2d 808, 816 (Minn. 1943)). If the language is clear and unambiguous, "statutory construction is neither necessary nor permitted and [we] apply the statute's plain meaning." Id. (quoting Am. Tower, L.P. v. City of Grant, 636 N.W.2d 309, 312 (Minn. 2001)). But if the statute is ambiguous—that is, if it is susceptible to more than one reasonable interpretation—we apply canons of construction to discern the legislature's intent. Id. (citing § 645.16); Amaral v. St. Cloud Hosp., 598 N.W.2d 379, 384 (Minn. 1999).

Minnesota's anti-incentive statute provides:

(a)     No person who provides retail auto glass products or services paid for in whole or in part, directly or indirectly, by an insurer regarding an insurance claim may:

. . .

-7-

> (2)     as an inducement to the sale of goods or services to an insured, advertise or give any rebate, gift, prize, bonus, coupon, credit, referral fee, trade-in or trade-in payment, advertising or other fee or payment, or any other tangible thing or item of monetary value, directly or indirectly, to an insured or any other person not in the employ of the seller.

Minn. Stat. § 325F.783.

The plain language of the statute indicates that the legislature intended to prohibit auto-glass vendors from offering incentives to induce insureds to choose their shops. See Ill. Farmers Ins. Co. v. Glass Serv. Co., 683 N.W.2d 792, 796 (Minn. 2004) (stating that the statute forbids auto-glass companies "from soliciting insureds as customers by offering gifts to those customers who choose to use their services"). The list of prohibited items reveals that the incentive must be something in addition to the auto-glass work the insured's vehicle requires, and the list's final phrase—beginning with the words "or any other"—indicates that the items preceding it constitute "tangible thing[s] or item[s] of monetary value." Moreover, the terms rebate and credit are not ambiguous. A rebate is commonly understood to be "[a] deduction from an amount to be paid or a return of an amount given in payment." Am. Heritage Dictionary of English Language 1457 (4th ed. 2000). The term credit has several definitions, but when used to describe an incentive, it means "[t]he positive balance or amount remaining in a person's account." Id. at 428.

Given the plain language of the statute and the ordinary meaning of the terms rebate and credit, we conclude that Alpine's practice does not violate the anti-incentive statute. Alpine does not offer any payment deduction, partial return of payment, or sum of money to be used as payment for future goods or services. It thus has not offered a rebate, credit, or anything that could be fairly described as a "tangible thing or item of monetary value." Instead, it completes the required auto-

glass work and accepts as payment the assignment of the insurance policy proceeds. The insured does not receive any tangible thing or item, in addition to the auto-glass work, that might set Alpine apart from other vendors or otherwise induce the insured to choose Alpine. Moreover, Farmers pays only for the required auto-glass work, not additional incentives.[3]

We agree with the district court's characterization of Alpine's practice as charging a contingent price:

---

[3]As the district court pointed out, the need for the anti-incentive statute, as well as the circumstances and purpose of its enactment, was "obvious—at least to some extent—to just about any Minnesotan who owns a radio or television." D. Ct. Order of Dec. 4, 2006, at 8. In the 1990s, the so-called auto-glass wars were raging in Minnesota. See Conrad deFiebre, No Free Steaks? Windshield War Crackdown Likely; Critics Say Bidding Drives up Insurance Costs, Star Trib., Dec. 21, 1999, at 1A. In the early 1990s, auto-glass shops began offering customers a free box of steaks when they had their windshield replaced. Id. "Before long, rival glass shops were offering cash, savings bonds, frequent-flier miles or four free boxes of steaks." Id. By December 1999, the incentives had escalated to cash rebates of up to five hundred dollars. Id. To tout their incentives, auto-glass shops flooded the airwaves and advertised heavily in the newspapers, trying to outbid each other for customers. See Bill Salisbury, House Passes Auto Glass Replacement Regulations; Box of Steaks Still Ok, Big Cash Rebates Are out the Window, St. Paul Pioneer Press, Mar. 23, 2000, at 4B ("Before the final House vote, [Representative] Wolf apologized to the Pioneer Press and Star Tribune 'because they're going to lose a whole bunch of advertising' when the bill becomes law."); see also Donna Halvorsen, Auto-glass Man Corporaal Sells out to Employees and Retires, Star Trib., Feb. 1, 2003, at 1D. Minnesota legislators feared that the costs associated with these incentives were being passed on to the insurer and that the insurer, in turn, passed the costs on to the policyholders in the form of higher premiums. See Committee Update: Auto Glass Addressed, Senate Briefly, Mar. 1, 2002, at 6. Accordingly, the legislature enacted Minnesota Statutes § 325F.783 in 2000 to limit the value of incentives to thirty-five dollars and amended the statute in 2002 to eliminate incentives altogether.

In effect, when Alpine quotes a price of $300 to a customer, it is saying: 'To repair your windshield, we will charge you the lesser of $300 or the amount that your insurance company will pay us.' This type of pricing cannot readily be described as involving a 'rebate' or 'credit.' The typical Alpine customer is unlikely to drive her repaired car home and tell her spouse about the 'rebate' or 'credit' that she received from Alpine. Indeed, a typical customer is unlikely to know or care how much Alpine receives for her new windshield.

D. Ct. Order of Dec. 4, 2006, at 10. Alpine thus takes on the obligation of negotiating the amount that is due under the policy and assumes the risk that the policy covers less than the amount quoted in Alpine's invoice. We fail to see this practice as an "as an inducement to the sale of goods or services to an insured," Minn. Stat. § 325F.783, particularly in light of Minnesota's statutory scheme, which "essentially removes the auto glass customer from the payment process," Glass Serv. Co., 683 N.W.2d at 796.

## C. Summary Judgment Dismissing Farmers's Breach of Contract Claim

Farmers contends that the district court erred in granting summary judgment in favor of Alpine on Farmers's breach-of-contract counterclaim. Farmers argues that the price lists it faxed to Alpine constituted offers and that Alpine accepted the offers when it performed auto-glass work on behalf of Farmers's insureds. We review the district court's grant of summary judgment *de novo*, viewing the evidence and the inferences that may reasonably be drawn therefrom in the light most favorable to the nonmoving party. Lexicon, Inc. v. ACE Am. Ins. Co., 634 F.3d 423, 425 (8th Cir. 2011).

To form a unilateral contract, Minnesota law requires a definite offer, communication of the offer, acceptance, and consideration.[4] Martens v. Minn. Mining & Mfg. Co., 616 N.W.2d 732, 742 (Minn. 2000). "An offer must contain sufficiently

---

[4]The parties agree that Minnesota law applies.

definite terms to enable the fact-finder to interpret and apply them." Neb. Beef, Ltd. v. Wells Fargo Bus. Credit, Inc., 470 F.3d 1249, 1251 (8th Cir. 2006) (citing Hunt v. IBM Mid Am. Emps. Fed. Credit Union, 384 N.W.2d 853, 857 (Minn. 1986)). Acceptance must be unequivocal and comply exactly with the requirements of the offer. Markmann v. H.A. Bruntjen Co., 81 N.W.2d 858, 862 (Minn. 1957). If the purported acceptance changes the terms of the offer, "it is not positive and unequivocal, and constitutes a rejection of the offer and a counteroffer." Id. (quotations and citation omitted).

Even if the blast faxes constituted offers to enter into unilateral contracts, Alpine rejected the offers when its actions failed to conform to the terms of the offer. The June 2002 fax informed the "Shop Owner/Manager" that Farmers had updated its pricing standards. The fax read, "To facilitate timely payment of invoices and avoid misunderstandings, please be sure to price all Farmers Insurance transactions in accordance with the prices indicated below." After listing the pricing structure and noting that it superseded previous pricing agreements, the document explained how to submit invoices and stated that "[b]ills that are accurate and are not more than this pricing structure will be paid promptly as submitted." Given the language of the document, mere performance of auto-glass work on the vehicles of Farmers's insureds did not constitute acceptance because the terms of the purported offer required that Alpine submit invoices in accordance with Farmers's pricing structure. There is no dispute that Alpine's invoices did not conform with Farmers's pricing structure.

The February 2005 fax included the same information as the June 2002 fax and went on to advise Alpine that it "may consider refusing the job if you are unwilling to provide service at the prices Farmers Insurance has offered above." The fax also provided that Alpine's rejection of the pricing terms would not "be binding on us or otherwise require us to pay you additional sums for services rendered" and that if Alpine desired to charge more than the pricing structure permitted, it "must advise our policyholders prior to initiating glass repair/replacement so that they can determine

whether they are willing to pay the additional costs for your services." Again, mere performance of auto-glass work did not constitute acceptance, and Alpine did not comply with the pricing requirements or the additional terms set forth in Farmers's purported offer.

In Minnesota, the "auto glass industry is highly regulated," Glass Serv. Co., 683 N.W.2d at 796, and the parties' conduct is better explained by Minnesota's auto-insurance statutory scheme than by any purported unilateral contracts. As set forth above, Minnesota law allows an insured to choose any auto-glass shop to repair or replace damaged auto glass. Minn. Stat. § 72A.201, subd. 6(14)-(16). The insurer must pay the vendor directly and must pay "a competitive price that is fair and reasonable within the local industry at large." Id. (quoting subd. 6(14)). Accordingly, after the insureds chose Alpine as their vendor and Alpine performed auto-glass work, Farmers was required to pay Alpine directly. Although Farmers frames the issue as a breach of a unilateral contract, the real dispute is what constitutes a "competitive price" and who dictates that price.

### D. Denial of Motion To Dismiss Arbitration Award

Farmers argues that the district court erred in holding that the E1400 endorsement established the limit of liability in policies that contained both endorsements. Farmers argues that we should reverse the district court, vacate the arbitration award, and remand for new arbitration proceedings with instructions to apply the MN008 endorsement. We conclude that such further proceedings are unnecessary because the arbitrator applied the "competitive price" standard set forth in MN008 and Minnesota Statutes § 72A.201, subdivision 6(14).

Before announcing the amount that Farmers underpaid Alpine, the arbitrator found that "Farmers was paying a rate not based upon competitive pricing in the auto glass replacement industry in Minnesota which is a competitive industry." This

language is almost identical to the language set forth in MN008 that Farmers will pay the "prevailing competitive price" and in Minnesota Statutes § 72A.201, subdivision 6(14), requiring that the insurer's payment be "based on a competitive price that is fair and reasonable within the local industry at large." The arbitrator's determination that Farmers "breached the terms of its insurance policy regardless of which limit of liability is applied," demonstrates that the arbitrator found that Farmers did not satisfy even the MN008 endorsement, which the parties have deemed less generous than the E1400 endorsement.

Farmers contends that a new arbitration is required because the arbitrator failed to see a distinction between the two endorsements and thus began his analysis from the false premise that there is no difference in the limitations of liability. Like the district court, we see little distinction between the two standards and echo its question "why it would ever be 'necessary' to pay more than the 'prevailing competitive price.'" D. Ct. Order of Feb. 26, 2010, at 10. We understand Farmers's argument that the word "necessary" denotes reasonableness, but the arbitrator's finding that the rate Farmers was paying was not "based upon competitive pricing" indicates that he applied a competitive price standard. Nothing in the arbitrator's decision indicates that he applied a reasonableness standard. Accordingly, the arbitrator's determination that "the award is the same regardless of which policy endorsement is applicable" does not require reversal or new proceedings because the award was based on the finding that Farmers failed to pay the competitive price.

III.

The judgments are affirmed.

_____