732 S.E.2d 205

**SOUTHERN GLASS & PLASTICS COMPANY, INC., Appellant,**

v.

**KEMPER, A Unitrin Business, Respondent.**

No. 5021.

Court of Appeals of South Carolina.

Heard May 24, 2012.

Decided Aug. 15, 2012.

Rehearing Denied Sept. 20, 2012.

484

Robert L. Jackson, of Columbia, for Appellant.

Ashley Berry Stratton, of Columbia, for Respondent.

KONDUROS, J.

This appeal arises from window replacement services performed for insureds of Kemper, an automobile insurance company, by Southern Glass & Plastics Company, Inc., an automobile glass repair and replacement business. Southern Glass contends the trial court erred in granting summary judgment to Kemper on Southern Glass's action to recover additional payments, determining the parties entered into an enforceable contract. We affirm.

## FACTS/PROCEDURAL HISTORY

Southern Glass performed twelve automobile glass replacements for insureds of Kemper. Southern Glass submitted invoices to Kemper, but Kemper only paid part of the amount requested for each automobile. Southern Glass brought an action in magistrate's court against Kemper for breach of contract, alleging it was owed $2,301.98. Southern Glass contended it had submitted invoices to Kemper for replacing the auto glass in twelve vehicles but Kemper had only paid part of the amount submitted for each vehicle. Kemper filed

an amended answer and counterclaim, which caused the amount in controversy to exceed $7,500, and the case was transferred to the court of common pleas.

Kemper filed a motion for summary judgment, contending Southern Glass was not entitled to full payment because it had billed for more than the parties agreed to and thus Kemper had not breached the contract. Kemper attached to its memorandum in support of its motion for summary judgment an affidavit from Brad Boardman. Boardman stated, "I oversee the national glass program for automobile coverage for Kemper...." He further stated, "Kemper handles automobile glass claims through a third-party administrator, Safelite Solutions." He also indicated, "Kemper reviews industry data for glass claims several times each year and determines whether rates are fair and reasonable for given areas." Boardman explained:

> When Kemper revises its rates, it notifies network and non-network glass shops in advance of the fair and reasonable rates it approves for glass claims. Kemper does not dictate what the shops should charge a customer, Kemper merely informs the shops what it is paying based on the insured's automobile policy and law.

Additionally, Boardman's affidavit stated:

> Rates are also shared with insured's [sic] and shops when the insured contacts Kemper, via Safelite, to report the glass claim. A customer service representative at Safelite contacts the shop of the claimant's choice during the claim call to inform them of the rates before the shop begins working on the claimant's vehicle.

The affidavit further stated, "After the shop agrees or understands what the rates are being paid by Kemper via Safelite on the phone, the shop receives a referral sheet once again confirming the rates Kemper will pay before [the] shop begins work on the claimant's vehicle." Boardman provided, "When the glass work has been completed, Kemper pays the claim based on the rate pre-notified and usually agreed upon by the glass shop."

Kemper also attached a document dated March 25, 2009, from Safelite Solutions addressed to Southern Glass and refer-

encing Matthew Keefe as the customer. The document listed the following prices:

W/S LIST: -37.0% LABR: $41.00 PER HOUR
C/T LIST: -37.0% LABR: $41.00 PER HOUR
KIT: $15.00 2KIT: $30.00
H/M KIT: $25.00 H/M 2KIT: $45.00

Additionally, the document provided, "KEMPER has determined the maximum amount of such work is: $483.82[sic] less any applicable deductible amount." The document also stated, "Performance of services constitutes acceptance of the communicated price and billing instructions." Kemper attached an auto insurance policy as well. The policy stated, "Our limit of liability for loss will be the lesser of the: 1. Actual cash value of the stolen or damaged property; or 2. Amount necessary to repair or replace the property with other property of like kind and quality." The policy also stated, "We will pay ... for loss to safety glass on 'your covered auto' without applying a deductible."

Southern Glass filed a memorandum in opposition to Kemper's motion for summary judgment and submitted an affidavit by its president, Alan S. Epley, stating, "Each time Safelite calls to inform us of the rates, we tell the employee of Safelite that Southern Glass does not accept the quoted rates." He further stated, "I have informed Safelite on more than one occasion that no contract is created when my company does the work." Epley also provided, "I have also notified Kemper and other insurance companies, directly or through Safelite, that our only contract is with our customer, the insured[,] and the customer has assigned to Southern Glass its right to receive payment pursuant to the terms of the policy."

At the hearing on the motion, Kemper stated it had recordings of all the telephone conversations from when Southern Glass and the insured called Safelite and had brought copies to the hearing. Kemper stated it had not attached the transcripts to its memorandum as an exhibit because it did not come up until Southern Glass's response memorandum, filed two days before the hearing. The trial court took a break to give Southern Glass the opportunity to review the transcripts. After Southern Glass had reviewed the transcripts, Kemper began to address the transcripts, and Southern Glass stated,

"I would object to the introduction—" The court responded, "I note your objection. I'm going to accept it anyway." Southern Glass asked, "You want to hear the grounds?" and the court responded, "Go ahead and put them on the record." However, Kemper then began describing the content of the transcripts and the objection was not discussed any further.

Kemper submitted a transcript from a recorded telephone call between an employee of Southern Glass and Safelite, as well as customer Luther McDaniel. In that conversation, Safelite stated, "I just need to know if you accept the job at the following pricing. . . . NAGS list minus thirty[-]seven percent, labor is $41.00 hourly and $15.00 per kit." The employee of Southern Glass stated, "We accept the job." Safelite stated, "Thank you. Your acceptance of the job also indicates that you have accepted these rates and these prices do not include tax or the cost of molding."

The trial court granted the motion for summary judgment, finding "[t]he existence of a binding enforceable contract is evidenced by transcripts of telephone conversations between [Southern Glass's] representative (a shop employee), [Southern Glass's] customer ( [Kemper's] insureds), and [Kemper's] third[-]party administrator (Safelite Solutions) wherein the glass claim was reported and express offer was made by Safelite on behalf of [Kemper]." The court determined "the telephone transcript evidences not only an express offer on behalf of [Kemper], but also an express acceptance on behalf of [Southern Glass]." The trial court found "[t]he offer was further confirmed in a fax sent by [Kemper's] third[-] party administrator to [Southern Glass] prior to the work being performed on the customer's vehicle," which "also stated: 'Performance of services constitutes acceptance of the above price and billing instructions.' " The court noted:

> After [Southern Glass] verbally agreed to [Kemper's] rates over the telephone and received the work order confirming the rates, it performed the glass work without objection or further communication with [Kemper's] third[-]party administrator. Thereafter, [Southern Glass] further confirmed its acceptance of [Kemper's] rates when it accepted and negotiated checks in the amount specified by the work order.

Southern Glass filed a motion to alter or amend pursuant to Rules 52(b) and 59(e), SCRCP. In regards to the telephone transcript, Southern Glass stated in a footnote in the motion, "[Southern Glass] objected to introduction of the transcript into evidence on the grounds that it had not been presented to counsel prior to the hearing. It was a surprise to counsel and prejudiced [Southern Glass's] case." The trial court denied the motion. This appeal followed.

## STANDARD OF REVIEW

The purpose of summary judgment is to expedite the disposition of cases not requiring the services of a fact finder. *George v. Fabri*, 345 S.C. 440, 452, 548 S.E.2d 868, 874 (2001). When reviewing the grant of a summary judgment motion, this court applies the same standard that governs the trial court under Rule 56(c), SCRCP; summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fleming v. Rose*, 350 S.C. 488, 493, 567 S.E.2d 857, 860 (2002). In determining whether a genuine issue of fact exists, the evidence and all reasonable inferences drawn from it must be viewed in the light most favorable to the nonmoving party. *Sauner v. Pub. Serv. Auth. of S.C.*, 354 S.C. 397, 404, 581 S.E.2d 161, 165 (2003). "Once the moving party carries its initial burden, the opposing party must come forward with specific facts that show there is a genuine issue of fact remaining for trial." *Sides v. Greenville Hosp. Sys.*, 362 S.C. 250, 255, 607 S.E.2d 362, 364 (Ct.App.2004). "[A]ssertions as to liability must be more than mere bald allegations made by the non-moving party in order to create a genuine issue of material fact." *Jackson v. Bermuda Sands, Inc.*, 383 S.C. 11, 17, 677 S.E.2d 612, 616 (Ct.App.2009).

## LAW/ANALYSIS

### I. Summary Judgment

Southern Glass argues the trial court erred in granting the motion for summary judgment because there was a genuine issue of material fact as Southern Glass disputed the existence of a unilateral contract by Epley's affidavit and its argument at the summary judgment hearing. We disagree.

 "The purpose of all rules of construction is to ascertain the intention of the parties to the contract." *Hansen ex rel. Hansen v. United Servs. Auto. Ass'n*, 350 S.C. 62, 68, 565 S.E.2d 114, 116 (Ct.App.2002) (internal quotation marks omitted). "The construction and enforcement of an unambiguous contract is a question of law for the court, and thus can be properly disposed of at summary judgment." *Id.* at 67, 565 S.E.2d at 116 (internal quotation marks omitted). When the terms of a contract are ambiguous, the question of the parties' intent must be submitted to the jury. *Id.* at 68, 565 S.E.2d at 116.

> A contract is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Id.* at 68, 565 S.E.2d at 116–17 (internal quotations marks omitted). Additionally, a contract is only ambiguous when it may fairly and reasonably be understood in more than one way. *Id.* at 68, 565 S.E.2d at 117. "[I]n construing an insurance contract, all of its provisions should be considered, and one may not, by pointing out a single sentence or clause, create an ambiguity." *Id.* (alteration by court) (internal quotations marks omitted).

 "The necessary elements of a contract are an offer, acceptance, and valuable consideration. A valid offer 'identifies the bargained for exchange and creates a power of acceptance in the offeree.'" *Sauner v. Pub. Serv. Auth. of S.C.*, 354 S.C. 397, 406, 581 S.E.2d 161, 166 (2003) (quoting *Carolina Amusement Co. v. Conn. Nat'l Life Ins. Co.*, 313 S.C. 215, 437 S.E.2d 122 (Ct.App.1993)). "A unilateral contract occurs when there is only one promisor and the other party accepts, not by mutual promise, but by actual performance. A bilateral contract, on the other hand, exists when both parties exchange mutual promises." *Id.* at 405, 581 S.E.2d at 165–66 (citation omitted).

 The elements for a breach of contract are the existence of the contract, its breach, and the damages caused by such breach. *Fuller v. E. Fire & Cas. Ins. Co.*, 240 S.C. 75,

89, 124 S.E.2d 602, 610 (1962). "The general rule is that for a breach of contract the defendant is liable for whatever damages follow as a natural consequence and a proximate result of such breach." *Id.*

A few courts across the country have considered a similar issue to the present case. In a North Carolina case:

> [T]he trial court based its judgment on three grounds: (1) GMAC[, an insurance company,] complied with the terms of its insurance contract; (2) GMAC paid defendant[, a glass company,] in accordance with unilateral contracts GMAC entered into with defendant; and (3) defendant's actions in cashing checks sent to it by GMAC, knowing that GMAC considered those payments "final," constituted an accord and satisfaction of any potential claim defendant might assert.

*CIM Ins. Corp. v. Cascade Auto Glass, Inc.,* 190 N.C.App. 808, 660 S.E.2d 907, 910 (2008). The North Carolina Court of Appeals recognized, "A unilateral contract is formed when one party makes a promise and expressly or impliedly invites the other party to perform some act as a condition for making the promise binding on the promisor." *Id.* The court provided that GMAC communicated through Safelite the prices it was willing to pay to defendant for services rendered to its insureds. *Id.* The court found the prices were communicated "(1) via letter to defendant's shops, (2) via telephone when initial claims were made, (3) via confirmation fax after claims were made but before work was performed, and (4) via eventual payment of invoices at the GMAC rate rather than defendant's rate." *Id.* "The confirmation faxes stated, '[p]erformance of services constitutes acceptance of the above price....'" *Id.* (alterations by court). "Although defendant protested the stated prices, these protests admitted that the confirmation faxes constituted offers-'The purpose of this letter is to address [the confirmation faxes] and to dispel any notion that we are in agreement with the *offered pricing.*'" *Id.* (alteration by court).

The court noted, "It is a fundamental concept of contract law that the offeror is the master of his offer. He is entitled to require acceptance in precise conformity with his offer before a contract is formed." *Id.* (internal quotations marks

omitted). "Here, the offer stated that acceptance was by performance. Because defendant performed the requested repairs or replacements, it accepted the terms of GMAC's offers, forming valid unilateral contracts at GMAC's stated prices." *Id.* "GMAC paid defendant pursuant to the terms of the unilateral contracts entered into between the parties. Defendant has not been 'underpaid' and is due no further payments. Therefore, summary judgment was properly granted against defendant." *Id.*

The Idaho Supreme Court has also considered a similar issue, finding Farm Bureau Insurance Company clearly stated it would pay the amount it agreed to and it had notified Cascade, a glass company, in advance the rates it would pay for glass repair and replacement. *Cascade Auto Glass, Inc. v. Idaho Farm Bureau Ins. Co.*, 141 Idaho 660, 115 P.3d 751, 755 (2005). The court found:

> Cascade had one of three options available to it upon receiving Farm Bureau's notice: it could simply do the work and accept the amount Farm Bureau had stated it would pay; it could accept the insurance payment and collect the difference from the insured; or it could refuse to perform services for Farm Bureau insureds unless the customer paid it for the work, leaving the customer to seek reimbursement from Farm Bureau.

*Id.* The court determined, "Cascade was unquestionably on notice of the amount Farm Bureau would pay and, nevertheless, proceeded with the work, knowing there was a limit on the amount it would receive. Farm Bureau paid the amount it had agreed to pay and has fulfilled its obligations under the policy." *Id.* The court further found:

> [T]he provisions of the insurance policy clearly provide that Farm Bureau can make a unilateral agreement about what amounts it will pay for windshield replacement or repair services. There is no issue of fact that once it made that determination, it provided notice in advance to all of the glass companies. The facts are also undisputed that Cascade accepted these Farm Bureau insured customers, agreed to provide the work, provided materials of like kind and quality, and was paid in full in the amount Farm Bureau had previously indicated it would pay. Therefore, Cascade has been paid all the money to which it was

entitled under the policy and there is no breach of the insurance contract.

*Id.*

The Washington Court of Appeals has also considered a comparable case, which examines a somewhat different issue. *Cascade Auto Glass, Inc. v. Progressive Cas. Ins. Co.*, 135 Wash.App. 760, 145 P.3d 1253 (2006). In that case, Cascade argued Safelite could not terminate the agreement between Cascade and Progressive because it was not a party to it. *Id.* at 1255. The court found, "Progressive presented unrebutted evidence that Safelite had authority to act as its agent in the price setting correspondence." *Id.* Cascade also argued, "Progressive's superseding letters were simply an attempt to unilaterally modify the terms of the pricing agreement, which Progressive could not do." *Id.* Cascade asserted the termination notice was deficient for two reasons: (1) "because the letters were unsigned and mass-mailed, they failed to give adequate notice to any particular glass shop that Progressive was terminating its pricing agreement" and (2) "the letters purported to unilaterally modify the terms of the pricing agreement rather than terminate the agreement altogether." *Id.* at 1256.

The Washington Court of Appeals found, "Progressive's superseding letters clearly signaled that it was no longer willing to pay according to the pricing agreement. Instead, Progressive offered to pay according to its new pricing standards. Cascade accepted Progressive's offer by performing glass work for Progressive's insureds." *Id.* at 1257–58. "A unilateral contract exists when one party offers to do a certain thing in exchange for the other's performance, and performance by the other party constitutes acceptance." *Id.* at 1258. The court held, "Cascade created binding unilateral contracts each time it repaired or replaced auto glass for Progressive's insureds after receiving Progressive's new offer. Progressive owes the amounts it promised to pay in the superseding letters; Cascade is entitled to no more than those amounts." *Id.*

The Connecticut Supreme Court has also looked at a similar situation but with differing results. *Auto Glass Express, Inc.*

*v. Hanover Ins. Co.*, 293 Conn. 218, 975 A.2d 1266 (2009). In that case, the court found:

> According to the plain language of the pricing letters, the only exchange proposed by the defendant is its promise to pay bills *timely* in exchange for the submission of bills that do not exceed its proposed pricing structure: "Bills that are accurate and are not more than this pricing structure will be paid promptly as submitted." In fact, the pricing letters, read as a whole, reinforce this interpretation.... The very first paragraph of the pricing letters sets forth the purpose of the letters, namely, "[t]o facilitate *timely* payment of invoices and avoid misunderstandings...."

*Id.* at 1273 (emphases added by court).

The court determined:

> [N]othing in the language of the pricing letters, either expressly or impliedly, suggests that the mere performance of glass repairs on automobiles insured by the defendant was sufficient to bind the plaintiffs to the defendant's prices. The pricing letters also do not indicate how the defendant intended to address invoices that did not conform to its pricing standards. The defendant's statement that its pricing structure represented what it believed to be "fair and reasonable prices for the market" failed to convey any intent that higher prices were unfair or unreasonable and would not be paid. Thus, we agree with the Appellate Court's observation that "[t]he [pricing] letters, therefore, do not evidence an intention on the part of the defendant not to pay a greater amount, but rather an intention not to pay a greater amount 'promptly.'" Further, the statement in the pricing letter that "[t]he prices listed [superseded] any prior pricing agreements," sheds no light on what performance was required in order to accept the defendant's new price terms. Because the plain language of the pricing letters clearly and unambiguously required the plaintiffs to submit invoices that reflected the pricing standards set forth in those letters in order to accept the defendant's offer of timely payment, and did not restrict the plaintiffs from submitting invoices reflecting higher prices, we need not look beyond the pricing letters to ascertain the defendant's intent.

*Id.* at 1273–74 (alterations by court) (footnote and citation omitted). The court held, "In light of the clear and unambiguous language of the pricing letters, we conclude that, in order for unilateral contracts to have been formed, the plaintiffs would have been required to accept the prices stated in those letters by submitting invoices that conformed to those prices." *Id.* at 1274. "The plaintiffs did not submit conforming invoices, and, therefore, the trial court improperly concluded that the parties had formed a series of unilateral contracts that supplied the amounts due from the defendant under the assigned insurance policies." *Id.* at 1275.

The Eighth Circuit Court of Appeals has also undertaken an analysis of an analogous scenario. *Alpine Glass, Inc. v. Ill. Farmers Ins. Co.*, 643 F.3d 659 (8th Cir.2011). In that case, "Farmers contend[ed] that the district court erred in granting summary judgment in favor of Alpine[, a glass company,] on Farmers's breach-of-contract counterclaim. Farmers argue[d] that the price lists it faxed to Alpine constituted offers and that Alpine accepted the offers when it performed auto-glass work on behalf of Farmers's insureds." *Id.* at 666. The court noted, "To form a unilateral contract, Minnesota law requires a definite offer, communication of the offer, acceptance, and consideration. An offer must contain sufficiently definite terms to enable the fact-finder to interpret and apply them." *Id.* (footnote, citation, and internal quotation marks omitted). "Acceptance must be unequivocal and comply exactly with the requirements of the offer. If the purported acceptance changes the terms of the offer, it is not positive and unequivocal, and constitutes a rejection of the offer and a counteroffer." *Id.* (citation and internal quotation marks omitted).

The court found:

Even if the blast faxes constituted offers to enter into unilateral contracts, Alpine rejected the offers when its actions failed to conform to the terms of the offer. The June 2002 fax informed the "Shop Owner/Manager" that Farmers had updated its pricing standards. The fax read, "To facilitate timely payment of invoices and avoid misunderstandings, please be sure to price all Farmers Insurance transactions in accordance with the prices indicated below." After listing the pricing structure and noting that it superseded previous pricing agreements, the document explained

how to submit invoices and stated that "[b]ills that are accurate and are not more than this pricing structure will be paid promptly as submitted." Given the language of the document, mere performance of auto-glass work on the vehicles of Farmers's insureds did not constitute acceptance because the terms of the purported offer required that Alpine submit invoices in accordance with Farmers's pricing structure. There is no dispute that Alpine's invoices did not conform with Farmers's pricing structure.

*Id.* at 666–67 (alteration by court). The court further provided:

The February 2005 fax included the same information as the June 2002 fax and went on to advise Alpine that it "may consider refusing the job if you are unwilling to provide service at the prices Farmers Insurance has offered above." The fax also provided that Alpine's rejection of the pricing terms would not "be binding on us or otherwise require us to pay you additional sums for services rendered" and that if Alpine desired to charge more than the pricing structure permitted, it "must advise our policyholders prior to initiating glass repair/replacement so that they can determine whether they are willing to pay the additional costs for your services."

*Id.* at 667. The court determined "mere performance of auto-glass work did not constitute acceptance, and Alpine did not comply with the pricing requirements or the additional terms set forth in Farmers's purported offer." *Id.*

 The present case can be distinguished from the Connecticut and the Eighth Circuit cases. In those cases, the courts noted that the company had merely stated that billing at those rates would result in timely payment. The present case is more in line with the North Carolina, Idaho, and Washington cases. In this case, Kemper notified Southern Glass of the rates and stated "performance of services irrevocable constitutes acceptance of the above price and billing instructions." Additionally, Southern Glass accepted the prices in the phone conversation. By proceeding with the work after receiving notice of the prices via phone conversation and fax, Southern Glass accepted the prices. Southern Glass argues that the court only considered one telephone

transcript in making its decision. However, at the hearing, Kemper stated that it had transcripts for all of the conversations between Southern Glass and Safelite. Kemper read to the court one of those transcripts, and that transcript is in the record. Southern Glass made no argument at the hearing that the transcript only represented one of the claims. Further, Southern Glass put up no evidence to show it had contacted Safelite or Kemper after receiving the fax to reject the prices in it. Accordingly, because the evidence does not create a genuine issue of material fact that Kemper breached its contract with Southern Glass, the trial court did not err in granting Kemper summary judgment.

## II. Introduction of the Transcript

■■■ Southern Glass argues the trial court erred in allowing Kemper to submit copies of alleged transcripts of telephone conversations as its introduction was a surprise and extremely prejudicial because it had no opportunity to refute the fact that the employee had no authority to bind the company. It also argues the transcript was not signed or certified. We disagree.

■■■ Southern Glass's memo opposing summary judgment was filed two days before the hearing, and Epley's affidavit, which is the first time Southern Glass asserted that it had informed Kemper that it rejected its pricing, was also filed two days before the hearing. The court gave Southern Glass a short time to review the documents, and Southern Glass did not request a continuance. Therefore, the trial court did not err in allowing the transcript. Additionally, a unilateral contract was created by Southern Glass's *performing* the work on Kemper's insureds, not by Southern Glass's verbal response. Thus, the transcript of the conversation did not prejudice Southern Glass. *See McCall v. Finley*, 294 S.C. 1, 4, 362 S.E.2d 26, 28 (Ct.App.1987) ("[W]hatever doesn't make any difference, doesn't matter."). Further, the argument pertaining to the transcript not being certified or signed is abandoned because Southern Glass makes only a passing reference to it in its brief and cites no case law for the argument. *See Glasscock, Inc. v. U.S. Fid. & Guar. Co.*, 348 S.C. 76, 81, 557 S.E.2d 689, 691 (Ct.App.2001) ("[S]hort, conclusory statements

made without supporting authority are deemed abandoned on appeal and therefore not presented for review.").

## CONCLUSION

The trial court did not err in finding no genuine issue of material fact existed and granting summary judgment. Further, any admission of the transcript was not in error. Therefore, the grant of summary judgment is

**AFFIRMED.**

PIEPER and GEATHERS, JJ., concur.